CHARLES BROWN, Plaintiff-Appellant, v. SCULLIN STEEL COMPANY, a Corporation, Defendant-Respondent, No. 43045—260 S. W. (2d) 513.

Division One, September 14, 1953.

*Courtney S. Goodman* for appellant.

*John S. Marsalek* and *Moser, Marsalek, Carpenter, Cleary & Carter* for respondent.

COIL, C.—Charles Brown, plaintiff-appellant, sued to recover $130,000 actual and punitive damages from defendant-respondent, Scullin Steel Company, based upon alleged negligence in ordering, directing, and permitting plaintiff to do work which defendant corporation knew or should have known he could not do with reasonable safety to himself because of his heart condition, and allegedly resulting in permanent injury to plaintiff. The trial court directed a verdict for defendant at the close of plaintiff's evidence. Plaintiff has appealed from the ensuing judgment, contending that his evidence was sufficient to make defendant's negligence and causation jury questions.

228

In determining this issue, we consider plaintiff's evidence true, construe it from a standpoint most favorable to him, and give him the benefit of all reasonable inferences to be drawn therefrom. Chamberlain v. Thompson, Mo. Sup., 256 S. W. 2d 779, 780[2].

Plaintiff, 43 years old at time of trial, applied to the company for work in February, 1943. Prior thereto he had done manual labor, including railroading, cotton farming, and furnace charging for a metal company. The company put him to work in the core room, first as a laborer, then as a coremaker. He left in February, 1949. In May, 1943, plaintiff was drafted and was rejected for reasons not appearing. The company rehired him on May 31, 1943. He left in June, 1946, and was rehired in September, 1946. He was "laid off" in December, 1946, and rehired in January, 1947.

Defendant employed a physician, Dr. Leo Will, whose duties included making physical examinations of applicants for employment, and in examining, treating, and advising employees. Dr. Will examined plaintiff before he was first hired and each time he was rehired; and made other examinations in February, July, and August, 1948, and in February, 1949. The pre-employment examinations included a check of the chest, heart, and lungs (including at times X-rays of the chest).

Plaintiff testified that his first work involved carrying parts weighing from 75 to 80 pounds. In 1944 he applied for and obtained a coremaker's job and handled cores weighing from 25 to 50 pounds; occasionally some weighed 50 to 175 pounds. He made about 92 cores per day and apparently carried them for short distances. He had not complained about his job or requested a different one. He knew of the company dispensary and of its availability to him, made no complaint concerning his heart or chest until July, 1948, and, from 1943 to 1946, inclusive, "felt fine." He did not know why the army had rejected him. He was treated for pneumonia in 1944, 1947, and 1948 by his own doctors who, each time, examined his chest but did not advise him with reference to continuing his work at defendant's plant.

Plaintiff did not know that anything was the matter with his heart until July, 1948. Neither defendant's doctor nor any other doctor had so advised him. In July, 1948, he fell against his core stand. Upon leaving work that day, he felt a burning sensation in his chest for about 15 minutes. That night he heard a buzzing sound which came from his chest. He returned next day, saw the dispensary nurse, felt "pretty good", and continued work.

On August 30, 1948, he complained to the nurse that he had "busted my heart" in that fall and that he had a pain in his left chest. The nurse administered heat treatment. The next day Dr. Will made an examination of plaintiff's chest after plaintiff had said: "I fell against the truck and busted my heart" and "I had a burning sensation like a pin sticking in me." Doctor Will told plaintiff he

could take a few days off if he so desired; plaintiff chose not to do so. The following day Dr. Will X-rayed plaintiff's chest, gave him some medicine, and told him to take it easy, but didn't say anything about any heart condition.

Sometime during December, 1948, plaintiff visited the St. Louis Municipal Clinic in response to a suggestion on the radio which "told you how you were feeling if your blood was bad" and "said if you felt that way to come down and get a blood test." The Clinic referred him to Midwestern Medical Center, U. S. Public Health Service. (The Center's records showed that plaintiff's condition was diagnosed as cardio-vascular syphilis for which he received treatment from December 17 to December 21, 1948; he was again admitted on January 17, 1949, and was discharged January 30, 1949.) Thereafter, he worked for the company one or two days and, in February, saw Dr. Will. The doctor told him: "Charley, the best thing for you to do is to go home and go to bed * * * and get your family doctor to look after you." Plaintiff left the job and has since been physically unable to do manual labor.

Dr. Will, a trained and experienced industrial surgeon, had been defendant's surgeon since 1912. He said that when he examined plaintiff in February, 1943, he found him to be in good physical condition except for a heart lesion evidenced by a hissing or whistling sound, referred to as a "sea gull murmur". He said he had never before heard that particular type of murmur; that it was unusual as to sound; that he could not tell from the sound what particular valve of the heart was involved; that the murmur indicated the incompetence of one or more heart valves; that, in so far as plaintiff's ability to work was concerned, it made no difference whether it was one valve or the other; that he indicated on the initial pre-employment physical examination record opposite "chest" the word "mitral" which meant a heart lesion and did not indicate the type of murmur.

Dr. Will testified that he told plaintiff of the heart murmur but that he, the doctor, was going to pass plaintiff for work; and "I hoped he wouldn't come back and kick me in the teeth"; that his reasons for making that statement were: "It is not an uncommon thing to employ men in industry, in this particular industry, with heart lesions. This man was thirty years old [the 1943 record showed plaintiff 30, other records indicated and plaintiff testified that he was 35 in 1943] and he was normal in weight, and his blood pressure was normal— * * * He had no signs of an individual that was suffering as a result of a heart lesion, many men are working and doing hard labor day in and day out that have a leaky heart, some know it and some don't, and my permitting a man to be allowed to work, or be employed, is based upon the general appearance of the individual, the rate of his pulse, the absence of other signs of decompensation, and in the absence of those

things and the man wanting to work, and able to work, I let him work, and I felt that man was able to work."

The doctor further said: "* * * the sound of the murmur has absolutely nothing to do with the physical condition of the individual. In other words, he may have several types of murmur but 'the mere sound of the murmur doesn't tell you whether he has a heart that is carrying on its normal function or not, nature can compensate for a leaking valve in the heart and gradually builds up the heart muscles so that it becomes thicker and does its extra work. Now, in a decompensated heart they have different clinical sounds that were not present in this individual that would lead me to believe he wasn't able to work, so I had him go to work, as I did many men. * * * The sound of the lesion is not very important to me in evaluating the ability of that individual to work, or evaluating whether he is compensated or decompensated." The exact cause of the heart lesion was not of material importance. The doctor found nothing abnormal in the chest other than the heart murmur. He obtained no electrocardiogram, although it is an aid in determining the condition of the heart.

On each occasion when Dr. Will examined plaintiff, he found the same peculiar, unusual heart murmur. He saw no reason to send plaintiff to a heart specialist because, except on one occasion (August, 1948) plaintiff did not complain of anything connected with his heart, although he was in the dispensary on numerous occasions for minor ailments. After each examination it was "my opinion, he was physically able to work, and I approved him to work as I did dozens of others of the same type * * * *."

Dr. Will said that, according to the dispensary record, plaintiff came into the dispensary on August 30, 1948. Plaintiff told the nurse that he had picked up one of his core boxes and felt a sharp pain near his heart. The nurse applied infrared heat treatment and told him to come back the next day when Dr. Will examined him and prescribed a sedative. Plaintiff at that time complained of his chest and Dr. Will examined and heard the same unusual murmur, but it was the doctor's opinion that plaintiff did not have a "decompensated heart" and that the chest complaint had no connection with the heart murmur. On the following day an X-ray revealed an enlarged heart which indicated that the muscle was thickened. Plaintiff had no shortness of breath although he was not required to exercise at the examination. Dr. Will said: "In the absence of any signs of decompensation, I think it is all right that he was to continue in work involving lifting cores weighing 90 pounds. If a man gets out and does ordinary work as this man was doing I don't think he was in any more danger of decompensating himself than if he had been lying around at home * * * because when your heart muscles become enlarged the minute that individual sits down and doesn't do any work, his heart muscles do the same thing." And, in Dr. Will's opinion, plaintiff's life had

not been shortened by reason of the work he did and the work had no effect on his heart. He said: "I don't think it [plaintiff's work] did, no, and my reason, one reason for this is that the man continued to work from '43 to '48, which was five years, during which time there was never any record referable to any condition involving his heart, so if he worked there all these years I think I did him a favor in giving him a job * * *. He worked there for five good years and in no way increased any trouble in so far as his heart was concerned." By having done plaintiff a favor, he meant: "Well, we have a lot of unoccupied people around looking for jobs and many of them cannot get jobs and when fellows with heart murmurs cannot find a job any place, and they don't want to take chances on them and get into a melee like this, and they exclude them, and say 'We won't take you'. That is my opinion, my policy, I don't know whether you call it humanitarian or what it is, but if a man wants to work, and willing to work, and in my opinion he is able to work, I'll let him work." He further explained his position by stating that if a man insists that he feels absolutely all right, and he is fit except for a heart murmur, he is properly employable; but if he had the heart murmur and also complained of shortness of breath or some other symptom of decompensation, he would not permit him to do that kind of work.

Chest X-rays were taken in February, 1943, September and November, 1946, February and August, 1948. The first showed a slight enlargement of the heart caused by the constant pulling up of the muscle. The others were essentially like the first.

When Dr. Will saw plaintiff on February 9, 1949, plaintiff told him that he had not worked for three weeks. At that time plaintiff was sick and Dr. Will advised him to see his family physician. Plaintiff did not tell Dr. Will that he (plaintiff) had syphilis or that he had been treated at the Midwestern Medical Center.

Dr. Melvin Goldman, a trained and competent internist, having done research in cardio-vascular diseases, stated that, while he didn't consider himself a heart specialist, he did have an adequate knowledge of heart diseases. When first seen by Dr. Goldman as a private patient on March 1, 1949, plaintiff complained of shortness of breath of a claimed eight months' duration. Dr. Goldman's examination included the taking of temperature, pulse, respiration, blood pressure, urinalysis, and blood tests, chest examination by fluoroscope, X-ray, and electrocardiograph. His diagnosis was: a ruptured aortic valve and suspected syphilis. The conclusion as to the heart was based solely on the type of murmur. It was a typical "sea gull" murmur sounding like the flapping of sea gull wings, or something like the noise made by a buzz saw. That type was "almost pathognomonic", which meant that it was almost certain that the sound was caused by a ruptured aortic valve. The tentative diagnosis of syphilis was confirmed by laboratory report on plaintiff's blood. The pulse, temperature, respi-

ration; blood pressure, and electrocardiogram reading were within normal limits. The X-ray and fluroscopic examination showed the heart slightly enlarged.

Thereafter Dr. Goldman saw plaintiff 15 times in 1949, 4 times in 1950, and four times in 1951, the last time shortly before trial. As we understand, the treatment administered was for syphilis. Three electrocardiograms were made, one each in March, 1949, June, 1950, and September, 1951. The first was normal, the second and third indicated some enlargement of the left ventricle. On May 1, 1951, plaintiff complained of fatigue, and on June 19, 1951, there were some moist rales indicating moisture in the lung. These were the first definite signs of decompensation. At the complete examination made on September 14, 1951, a few rales at the base of the lung were again noted, and there was a questionable edema of the ankle. The X-ray and fluoroscope findings had not changed materially from those of March, 1949. All the X-rays taken by Dr. Goldman were essentially the same, and essentially the same as those taken by Dr. Will.

In answer to a hypothetical question, Dr. Goldman said: "My opinion would be that this man's life was shortened because of the manual labor [at defendant's plant] he performed during those period of years." As to plaintiff's present physical condition, "I think it was due to those things." By "those things" he meant "working in that particular type of labor, that manual labor, exertion, that particular type of exertion like any other exertion, would be a detriment to his cardiac condition, and would aggravate it", and that the work plaintiff was doing "did have an influence on this man's life by aggravating the cardiac condition." Assuming that plaintiff had this heart condition when he first went to work for defendant: "This type of heart disease, if you can make a diagnosis, was syphilitic aortic, and this condition carried certain prognosis with it". By the prognosis "carried with it", he meant: "What is going to happen to a person with this type of heart condition. Now that is a variable thing, some men go long periods of time and others may not go so long with this particular condition, however, the course we can generalize and it is very difficult to do, of course it is a slightly progressive one, and if we add to that a burden on the heart by various means, it can be through illness and it can be by exertion in various forms, and it can be by fever, that will shorten the expectancy of it, to which the heart can function. Now, if you take such an individual and have them doing manual labor, within reasonable medical certainty it is detrimental. * * * It has been my opinion from previous experience, that physical exertion is detrimental to one who has a cardiac disease." And: "* * * when you add a burden to an abnormal heart it follows that the life of that heart is going to be shortened, and statistically that has been shown to be true." Exertion is harmful, according to the doctor, because when a great demand is

put on the blood vessels that go into the heart by way of exercise or fever or other conditions, more blood has to be brought to the heart, which means that the muscle is going to be enlarged. "* * * but if an individual does too much work there won't be enough blood brought to the heart and we have a condition that means the heart muscle is not getting enough blood and that is when the individual has pain. * * * and if you continue to do this [place an added strain on the heart] something very serious usually happens, and that is termed thrombosis." ▩ When an additional burden is thrown on the heart and the heart muscles acquire sufficient strength, the man is compensated, that is, he is getting along and clinically is not feeling much better or worse, or affected as far as the man's ability to work is concerned. And then due to various things, the muscles are no longer able to keep up with the burden, decompensation occurs, evidenced by such symptoms as shortness of breath on either exertion or in doing the simplest things, and lung rales; these symptoms indicate that the heart can no longer compensate for its deficiencies. As a result of syphilis, the aortic valve may be so changed that the blood rushes through and causes a murmur; and generally a heart condition due to syphilis begins between the ages of 40 and 50.

In Dr. Goldman's opinion, plaintiff was, at the time of trial, permanently totally incapacitated for manual labor and that whether he could do light work, such as a checker, "you would have to try him and see."

Defendant's personnel manager testified that he was present at Dr. Will's initial examination and heard the unusual heart murmur; that, because Dr. Will passed plaintiff for employment, he put plaintiff to work in the core room; that he heard Dr. Will tell plaintiff "about this peculiar sound he had heard; he had an unusual heart there, he had never heard that particular type, and he said, 'I hope you don't let it kick back in my teeth.'"

▩ Plaintiff relies upon Hamilton v. Standard Oil Co., 323 Mo. 531, 19 S.W. 2d 679. It is true that, while that case is clearly distinguishable upon its facts, the principles there stated are applicable to the instant case. Under the Hamilton case, if defendant here "had knowledge, either actual or constructive, of plaintiff's physical condition and of his capacity to do physical labor, and knew or should have known that plaintiff could not reasonably and safely do the work which" he was ordered to do, "and that he would likely be seriously injured if he attempted it," defendant was "guilty of negligence in ordering him to do the work". Hamilton v. Standard Oil Co., supra, 19 S.W. 2d 683, 684. And the Hamilton case also holds that the knowledge of a regularly employed company physician is the knowledge of the employer-company. Hamilton v. Standard Oil Co., supra, 19 S.W. 2d 689. But, unlike the factual situation in the Hamilton case, where defendant company ordered its employee to do certain

work against the conveyed-to-employer advice of its physician, here defendant company followed and acted upon the conveyed conclusion of its physician, viz., that plaintiff could, with reasonable safety, do the work he was ordered or permitted to do. It must follow, under instant facts, that defendant could not be negligent (in the absence of negligence in choosing or retaining its physician, of which there is no evidence) unless the physician himself was negligent in arriving at or in holding the opinion which caused defendant to permit plaintiff to do work despite his known heart condition. Instant defendant's negligence, then, must be gauged by the standards which would be applicable if this action had been brought by plaintiff against defendant's physician as an individual.

The fact, standing alone, that Dr. Will may have been wrong in his conclusion (that plaintiff could do this work without likely injury to himself other than the inevitable progression of his heart disease, which he would sustain were he doing no work) is not sufficient to convict Dr. Will, and defendant through him, of negligence. There must also have been some evidence either, that Dr. Will did not possess the requisite skill and knowledge to arrive at a conclusion, or that he failed to use his skill and knowledge in arriving at his conclusion, or that his conclusion was not based upon or in accord with any recognized medical theory or practice.

As we view the medical testimony, it is evident that plaintiff's heart condition, as discovered and diagnosed by Dr. Will in 1943 and thereafter, was essentially the same heart condition found and diagnosed by Dr. Goldman in 1949. That is to say, Dr. Will was cognizant of the condition of plaintiff's heart. There was no evidence of a negligent examination or of a wrong diagnosis. (And we point out here that this is not a case in which defendant, through its physician, undertook to treat plaintiff.) Nor was it shown that Dr. Will failed to possess the usual skill and learning of an industrial surgeon in his community or that he failed to use his skill and learning in diagnosing plaintiff's condition or in reaching his conclusion as to plaintiff's ability to work. That Dr. Will did not take an electrocardiogram is of no significance because plaintiff's evidence showed that the electrocardiogram made by Dr. Goldman in March, 1949, reflected a normal heart. Nor is it significant that Dr. Will did not refer plaintiff to a heart specialist; Dr. Will knew that plaintiff had a heart lesion and there was no showing that Dr. Will, as an industrial surgeon, was not competent to judge its effect upon plaintiff's employability in the proposed work. Nor was the fact that Dr. Will did not discover that plaintiff had syphilis important because it is fairly inferable that the syphilis had caused the heart condition found by Dr. Will, and there was no evidence that a ruptured aortic valve due to syphilis was different from one due to other causes. And the statement Dr. Will made to plaintiff ("I hoped he wouldn't come

back and kick me in the teeth'', or ''I hope you don't let it kick back in my teeth'') shows, as plaintiff contends, that Dr. Will was cognizant of the incompetency of one or more heart valves. This statement indicates, not only that Dr. Will found the condition and diagnosed it, but that he also considered it in making his finding and diagnosis and in forming his opinion as to whether, despite the heart condition, he should ''pass him for work''.

This case does not turn on defendant's knowledge of plaintiff's condition, for, as we have noted, defendant, through its physician, had such knowledge. The question is not whether defendant knew of plaintiff's condition, it is rather, so knowing, did Dr. Will know, or should he have known, that to permit plaintiff to work as a coremaker would be likely to cause injury other than injury plaintiff would suffer in any event. Now certainly Dr. Will did not so *know*, because plaintiff proved that it was Dr. Will's conclusion or opinion, based upon his knowledge of plaintiff's heart condition, that plaintiff was, despite his condition, capable of performing such manual labor without likelihood of injury other than that he would sustain whether or not he was working. Dr. Will's conclusion was based upon his opinion that plaintiff's heart condition would progress at about the same rate whether plaintiff was working as a coremaker or whether plaintiff was unemployed and ''lying around home''. The question then is, *should* Dr. Will have known to the contrary, or, more precisely, was there evidence from which the jury reasonably could so find?

If we are to answer in the affirmative, we must do so upon a consideration of Dr. Goldman's testimony. This, fairly construed from the standpoint most favorable to plaintiff, was essentially that plaintiff's heart was in such condition, at all times when Dr. Will examined him, that any strain put upon that heart, such as the manual labor performed at defendant's plant, would cause a shortening of the life of the heart or, expressed differently, would hasten the development of symptoms of decompensation. And while Dr. Goldman was not asked and did not state specifically whether he would or would not have passed plaintiff for employment as a coremaker, or for any other employment, had he possessed the same knowledge of plaintiff's condition as did Dr. Will at the time plaintiff was employed and re-employed, the jury could reasonably infer from Dr. Goldman's testimony that he would not have done so. But Dr. Goldman did *not* testify that Dr. Will's opinion (that plaintiff could do the particular work without materially hastening the development of symptoms of decompensation) was contrary to recognized medical theory and practice in the City of St. Louis and vicinity. It would appear that whether Dr. Will's opinion was or was not sustainable upon recognized principles and practice of the medical profession could be determined by a jury only upon the expert opinions of those having special knowledge and qualified to testify on such matters. A careful analysis of 

Dr. Goldman's testimony convinces us that it does not authorize a reasonable inference that an opinion different from his (Dr. Goldman's) was necessarily contrary to any recognized opinion or theory of the medical profession. It should be noted that all of plaintiff's testimony supports the conclusion that his present condition would have occurred in any event, i.e., with the passage of time plaintiff's syphilitic aortic heart would have caused the development of the same symptoms of decompensation present in plaintiff at the time of trial. In other words, plaintiff's pre-existing heart disease was a progressive one and the steps in the progression of that disease would have occurred in any event, whether or not plaintiff ever had worked as a coremaker.

Now, it is true that the jury was at liberty to accept or reject any or all of Dr. Will's testimony, and thus the truth or validity of Dr. Will's opinion as to the effect of the work upon plaintiff and his conclusion based thereon (that plaintiff could work without other than inevitable injury, despite his heart condition) could be accepted or rejected as the jury chose. And the jury could accept and believe the opinion of Dr. Goldman that the added strain of plaintiff's work would, and did, hasten the development of symptoms of decompensation. But the *fact of the existence* of Dr. Will's opinion was a fact adduced by plaintiff's evidence. Plaintiff could not supply the deficiency in his affirmative proof, viz., that the opinion of Dr Will was contrary to and not based upon recognized medical principles and practice, by the jury's right to disbelieve the truth of Dr. Will's opinion or conclusion, or by its right to accept and believe the validity and truth of Dr. Goldman's opinion.

Thus, plaintiff's evidence established that there were two conflicting medical opinions as to whether one in plaintiff's condition could do the work he did without injury other than that he would suffer as surely and as quickly as if he had done no work or had done different work. Such was not sufficient to establish negligence under the facts of this case.

"Physicians and surgeons must be allowed a wide range in the exercise of their judgment and discretion. The science of medicine is not an exact science. In many instances there can be no fixed rule by which to determine the duty of a physician, but he must often use his own best judgment and act accordingly. By reason of that fact the law will not hold a physician guilty of negligence as long as he uses his best judgment, even though his judgment may prove erroneous in a given case, unless it is shown that the course pursued was clearly against the course recognized as correct by the profession generally." Bailey v. St. Louis-San Francisco Ry. Co., Mo. App., 296 S.W. 477, 479[2]. The above-quoted statement was made in a case wherein the question was whether there was substantial evidence of negligence for failure of a surgeon to operate plaintiff for hernia. Similar expres-

sions are found in cases wherein the physician's negligence was alleged to have been a wrong diagnosis, or wherein the physician's or surgeon's alleged negligence was failure to use recognized methods or appliances. We see no reason, however, why the principle of the quoted statement should not be applied to instant facts, i.e., a factual situation wherein the physician's alleged negligence was an opinion which resulted in plaintiff doing certain work even though plaintiff had, and defendant's physician knew he had, a certain heart disease. We hold, that, in the absence of evidence from which a jury could reasonably have found that Dr. Will's opinion, even though erroneous, was contrary to recognized medical opinion and practice, plaintiff failed to sustain his burden of proof and that the trial court correctly directed a verdict for defendant. The judgment is affirmed. *Van Osdol* and *Lozier, CC.,* concur.

PER CURIAM:—The foregoing opinion by Coil, C., is adopted as the opinion of the court. All the judges concur.