**Helen P. FISHER, Appellant,**

v.

**Everett A. WILKINSON, and G. Robert Reinhardt, Respondents.**

**No. 49337.**

Supreme Court of Missouri,

Division No. 2.

Sept. 14, 1964.

Rehearing Denied Oct. 12, 1964.

Elwyn L. Cady, Jr., Kansas City, for appellant.

Roy F. Carter, Kansas City, Sprinkle, Carter, Sprinkle & Larson, Kansas City, of counsel, for respondents.

STOCKARD, Commissioner.

Plaintiff has appealed from a judgment in favor of defendants entered pursuant to jury verdict in her suit for alleged malpractice wherein she sought damages in the amount of $130,000.

Plaintiff's only point on this appeal pertains to the giving of an instruction at the request of defendants. However, defendants contend that plaintiff did not make a submissible case for the jury. For the reasons subsequently set out we agree with defendants' contention, and it is therefore unnecessary to discuss the allegedly erroneous instruction.

Dr. Everett A. Wilkinson had been the family physician for plaintiff since 1937. In April 1958 he performed an operation on plaintiff to remove her gall bladder. She was hospitalized about two weeks and had what was referred to as an uneventful operation and confinement. On the third day after her release from the hospital her son called Dr. Wilkinson by telephone and stated that plaintiff was "sick," that she had a · "slowing" of urine, and that she appeared to have a temperature. Dr. Wilkinson . asked that plaintiff's son obtain a thermometer and take his mother's temperature. When this was done it was then after office hours, and plaintiff's son talked to Dr. Reinhardt (who was associated with Dr. Wilkinson in the practice of medicine) and related to him the symptoms of his mother. Dr. Reinhardt testified that in view of the recent gall bladder operation, the symptoms indicated that plaintiff had a urinary tract infection. He first suggested that plaintiff be given a sulpha drug, but her son stated that his mother had been allergic to it in the past. The doctor then prescribed terramycin, and he testified at trial that it was

the "commonly accepted medication for this condition." No house call was requested by plaintiff or her son.

Plaintiff testified that on the following day, a Sunday, she was "no better," and that her skin was beginning to have a sensation of scratching as though "someone had rubbed me with wire." On Monday she called Dr. Wilkinson and told him that she still had a temperature, and that she had a "sensation" in her face and eyes. She testified that she asked Dr. Wilkinson if the cause could be the medicine she was taking and he replied that it was not, and that "everybody takes terramycin." On the following Wednesday, in response to a request from plaintiff, Dr. Reinhardt made a house call to see plaintiff. He testified that at that time he did not notice anything unusual about plaintiff's skin and he diagnosed her condition as a low-grade urinary infection. He obtained a urine specimen for examination, and later reported to plaintiff by telephone that there was nothing in her urine "to worry about." Plaintiff's son testified that his mother had redness around her eyes and that "they were starting to puff and swell." However, it is not clear from his testimony when he first noticed this condition. Mrs. Mamie Winn, who was visiting plaintiff, testified that she was present when Dr. Reinhardt called, and that plaintiff then had very small red spots beneath the surface of the skin, and that her eyes "were swollen and puffy looking." Plaintiff testified that when Dr. Reinhardt was there he "pulled my gown and housecoat down, and looked around a little" and said that he "could see no redness." While plaintiff did not specifically so state, the inference is that Dr. Reinhardt made this examination by reason of some suggestion or complaint by plaintiff.

On the following Tuesday, May 6, Dr. Reinhardt returned to see plaintiff, and at that time plaintiff was "obviously sick," although not "critically ill," and she "had a redness, a rash, * * * over her face and shoulder, * * * [and the] upper part of her trunk" which was "an allergic reaction to something." He told her that she "should be in the hospital immediately," but she "absolutely refused" because she said that she could not afford it and she did not think she was yet that sick. Dr. Reinhardt then prescribed a cortisone preparation which was a recognized treatment for allergic reaction. On Thursday, May 8, she re-entered the hospital where her condition was diagnosed as exfoliative-dermatitis.

Dr. Wilkinson testified that all drugs have potential "side effects," including aspirin, depending upon the individual. He further stated that the only side effects of or reaction to terramycin of which he was aware by reason of his own experience, "and that would include possibly any case that has ever been in Research Hospital," was "pseudo-mucinous entercolitis" which is a reaction that occurs in the bowel resulting from the antibiotic killing off normal bacteria as well as the infection producing bacteria.

Dr. Harry Wiener, of New York, who was associated with Chas. Pfizer & Company, producer of terramycin, as associate medical director and director of technical writing, testified that dermatitis was not an expected or a common condition to be looked for in the use of terramycin, and further that the occurrence of exfoliative-dermatitis brought to his attention by Dr. Wilkinson and Dr. Reinhardt in 1958 was the only case in which it appeared that the cause could be traced to the use of terramycin. The "package insert" or "package brochure" supplied in 1958 by Chas. Pfizer & Company with terramycin and available to members of the medical profession, contained a paragraph headed "Precautions," and therein it was stated that "Glossitis and dermatitis as reactions of an allergic nature may occur but are rare. If adverse reactions occur or individual idiosyncracy or allergy occur, discontinue medication." Dr. Wiener testified that the term "dermatitis" used in the brochure was used without the term "exfoliative" and with reference only "to dermatitis, meaning essentially a skin irritation" which does not include exfoliative, and the two are distinct conditions, the ex-

foliative-dermatitis being a "much more serious condition than dermatitis alone" and also being a "very rare condition."

Plaintiff does not charge that defendants do not each possess the requisite knowledge and skill. In fact, the testimony establishes beyond doubt that they do. She does charge negligence on their part in the failure to exercise that skill, and those charges as set out in her verdict directing instruction are as follows:

(1) defendants failed "to make a reasonably careful examination * * * to discover and diagnose the ailment or ailments from which she was suffering;"

(2) defendant Dr. Reinhardt called upon, examined and treated plaintiff at "irregular intervals" and "too far apart to treat effectively plaintiff in her illness, * * * [thereby] depriving plaintiff of the continuous attention of a physician who had the benefit of observing day to day changes in plaintiff's condition;"

(3) defendants failed to "change the medical care and treatment of plaintiff after it should have been reasonably apparent to a physician of ordinary skill and learning that plaintiff was not responding favorably to the treatment given;"

(4) defendants failed to discover within a reasonable period of time that plaintiff was suffering from an allergic reaction after it should have been reasonably apparent; and

(5) defendants failed "to administer such treatment as under the circumstances should have been administered by ordinarily careful physicians acting with reasonable care and their best judgment in Kansas City, Missouri."

We express no view as to whether plaintiff's verdict directing instruction would have sustained a verdict for plaintiff if a submissible case had been made.

■ "The standard of care imposed upon the defendant in a malpractice case has been stated as follows: 'The defend-ant was required to use and exercise that degree of care, skill, and proficiency which is commonly exercised by the ordinarily skillful, careful, and prudent physician and surgeon engaged in similar practice under the same or similar conditions. It is not sufficient that he may have possessed the requisite training and skill; he must also have used and applied it in the treatment of the plaintiff.'" Rauschelbach v. Benin-casa, Mo., 372 S.W.2d 120. See also Steele v. Woods, Mo., 327 S.W.2d 187, 196, and Williams v. Chamberlain, Mo., 316 S.W.2d 505, 510. However, as long as the physician has the requisite skill and exercises the requisite degree of care, he is not liable in a malpractice action for an honest error of judgment, and having so acted, he is not liable merely because of an unexpected or bad result. Williams v. Chamberlain, supra; Mann v. Grim-Smith Hospital and Clinic, 347 Mo. 348, 147 S.W.2d 606; Ewing v. Goode, C.C.S.C.Ohio, 78 F. 442, 443; 41 Am.Jur. Physicians and Surgeons. § 103. In an action for malpractice based on specific negligence no presumption of negligence on the part of a physician is indulged in by the courts by reason of an adverse result from medical treatment, 41 Am. Jur. Physicians and Surgeons § 127; 70 C.J.S. Physicians and Surgeons § 62, but plaintiff has the burden to establish the negligence on the part of the physician in failing to exercise his skill or the requisite degree of care, and his burden also includes presentation of proof that the negligent acts caused the injury. Pedigo v. Roseberry, 340 Mo. 724, 102 S.W.2d 600. Plaintiff offered no expert medical testimony, and her evidence consisted only of the testimony of herself, her son, her daughter-in-law, a family friend (none of whom qualified as a medical expert witness), the hospital records, and certain excerpts from the depositions of Dr. Wilkinson and Dr. Reinhardt.

Without detailing the medical testimony presented on behalf of defendants it may be said that it was to the effect that in the treatment of plaintiff the defendants.

did employ that skill and care used and exercised by the ordinarily skillful, careful and prudent physician acting under the same or similar circumstances. Plaintiff's evidence did no more than establish the presence of the illness, the treatment therefor selected by the defendants, and the adverse result in the form of an allergic reaction. The question thus presented is whether a jury, composed of lay personnel, may determine from the evidence that the defendants failed to conform to the required standards and for that reason were negligent.

The first and fourth charges of negligence above set out and taken from plaintiff's verdict directing instruction pertain to the diagnosis of plaintiff's ailment. Because of the failure to hypothesize the facts it is not clear whether it was intended by plaintiff that the first charge should pertain to a failure to make a careful examination to discover that plaintiff was in fact suffering from a urinary tract infection before prescribing terramycin, or to a failure to examine and discover that after the administration of terramycin she was suffering from exfoliative-dermatitis. However, we find no contention that the diagnosis of the presence of a urinary tract infection was erroneous, and we find no contention that the use of terramycin, absent a situation where the physician knew or should have known of an adverse reaction, was not the proper treatment for such condition. Neither is there a contention that the diagnosis of exfoliative-dermatitis was erroneous. Therefore, the only questions presented by the first and fourth charges of negligence are whether from the evidence the jury could find that defendants were negligent in failing to discover that plaintiff was allergic to terramycin before administering it, and failing to discover the allergic reaction within "a reasonable period of time."

The other three charges of negligence pertain to the treatment administered by defendants. The third charge expressly required the jury to find that the treatment did not meet the standard of "ordinary skill and learning," and the fifth charge required the jury to find that what was done was not what would have been done by "ordinarily careful physicians acting with reasonable care and their best judgment." The second charge of negligence is that the treatment was at "irregular intervals" and "too far apart" so that plaintiff was deprived of "the continuous attention of a physician who had the benefit of observing day to day changes in plaintiff's condition." Perhaps a patient could contract for the "continuous attention" of a physician, but in a tort action for negligence, absent expert testimony to the effect that plaintiff's condition was such that the standards required of physicians called for "continuous attention," this charge of negligence presents a theory for which we find no precedent.

It has frequently been said that when the issue for determination by the jury is whether the defendant physician exercised the proper skill in the diagnosis and treatment of plaintiff's illness, which includes the selection of the remedy, expert medical testimony ordinarily is essential because only in exceptional cases may a jury of lay personnel make a determination based on common knowledge whether the conduct of the physician was in violation of the required standards imposed by law. Williams v. Chamberlain, supra, 316 S.W.2d at p. 511; Mitchell v. Robinson, Mo., 334 S.W.2d 11, 79 A.L.R.2d 1017; Steele v. Woods, Mo., 327 S.W.2d 187, 198; Morgan v. Rosenberg, Mo.App., 370 S.W.2d 685; 70 C.J.S. Physicians and Surgeons § 62 d(2), p. 1006. In Williams v. Chamberlain, supra, this court quoted with approval from Hopkins v. United States, D.C.W.D.Mo., 152 F.Supp. 473, as follows: " 'A plaintiff in a malpractice action assumes a very heavy burden where the basis of recovery is predicated on an attack on the technique and skill exercised by an operating surgeon or on a charge that he failed to exercise reasonable judgment. In the absence of most unusual circumstances it is

a burden that cannot be discharged in normal course by lay testimony. * * * When plaintiff fails to show by calling an expert that the care given by defendant and its agents falls below the required standard of the school of medicine to which he belongs, and fails to show that [the physician] neglected to use standards of skill and treatment required of others in the area, then plaintiff has failed in her burden.' "

■ "The making of a diagnosis [by a physician] is largely a matter of judgment. Even if there be an erroneous or mistaken diagnosis the mistake must be a negligent one to create liability." Williams v. Chamberlain, supra, 316 S.W.2d at p. 512. See also Gottschall v. Geiger, 207 Mo.App. 89, 231 S.W. 87, 95; Trask v. Dunnigan, Mo.App., 299 S.W. 116, 117; Sibert v. Boger, Mo., 260 S.W.2d 569; McDonald v. Crider, Mo.App., 272 S.W. 980; Skodje v. Hardy, 47 Wash.2d 557, 288 P.2d 471; 41 Am.Jur. Physicians and Surgeons § 92. Also the mode of treatment selected by a competent physician for the treatment of an injury or illness is largely a matter of professional judgment. Williams v. Chamberlain, supra, 316 S.W.2d at p. 512. That would include the frequency of house calls, 41 Am.Jur. Physicians and Surgeons § 100, and also whether a change should be made in the method of treatment. All of these matters call for the exercise of the judgment of a trained person and are beyond the common knowledge and experience of lay persons. "If laymen [who sit on juries] are not to be guided on issues requiring peculiar and thorough special training in a science or art beyond the experience and knowledge common to mankind by witnesses possessing the necessary testimonial qualifications, juries will be cast into a river of doubt and must establish an arbitrary standard of their own founded upon conjecture and surmise in their effort to reach certain and sure ground. Juries should not be thus turned loose and privileged to say, perchance, the method of treating an injury * * * [or an illness]

was negligent notwithstanding, for instance, the uncontradicted competent testimony establish[ing] that the uniformly adopted practice of the most skillful surgeons [or physicians] had been followed." Pedigo v. Roseberry, 340 Mo. 724, 736, 102 S.W.2d 600, 607. Without the aid of expert medical testimony in this case a jury could not, without resorting to conjecture and surmise or by setting up an arbitrary standard of their own, determine that defendants failed to exercise their skill and use the care exercised by the ordinarily skillful, careful and prudent physician acting under the same or similar circumstances.

■ It is recognized that in certain cases involving malpractice the testimony of an expert witness is not always necessary to make a submissible case for the jury. Williams v. Chamberlain, supra, 316 S.W.2d at p. 511; 70 C.J.S. Physicians and Surgeons § 62 at p. 1009. See also the discussion of this question in the note, "The Law of Malpractice in Missouri," Washington University Law Quarterly, June 1962, p. 409, where a logical differentiation of the cases is presented. However, this case clearly is one where expert medical testimony is required. See Pedigo v. Roseberry, supra, Sontag v. Ude, 191 Mo.App. 617, 177 S.W. 659; Brown v. Scullin Steel Co., 364 Mo. 225, 260 S.W.2d 513; Snyder v. St. Louis Southwestern Ry. Co., 228 Mo.App. 626, 72 S.W.2d 504; Fausette v. Grim, 193 Mo.App. 585, 186 S.W. 1177.

We necessarily conclude that the plaintiff failed to make a submissible case for the jury, and it is therefore immaterial whether or not the instruction complained of was erroneous.

The judgment is affirmed.

BARRETT, C., concurs.

PRITCHARD, C., not participating.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All of the Judges concur.