Gloria I. ODUM, Plaintiff-Appellant,

v.

Leandro P. CEJAS, Defendant-Respondent.

No. 9258.

Missouri Court of Appeals, Springfield District.

May 17, 1974.

Maurice B. Graham, Schnapp, Graham & Reid, Fredericktown, for plaintiff-appellant.

Manuel Drumm, Sikeston, for defendant-respondent.

STONE, Judge.

This is an action by plaintiff Gloria I. Odum against defendant Leandro P. Cejas, M.D., for alleged malpractice. The only assignment upon which plaintiff's counsel relied was defendant's alleged negligence in postoperative care of plaintiff following a hysterectomy. At the close of plaintiff's case, defendant's motion for a directed verdict was sustained on the ground that plaintiff had failed to make a submissible case on the essential element of causal connection between the negligence charged against (but in no wise conceded by) defendant and the condition of which plaintiff complained. From the judgment for defendant then entered, plaintiff appeals.

Defendant is an obstetrician and gynecologist at the Ferguson Medical Clinic in Sikeston, Missouri. He first saw plaintiff when she came to his office on May 13, 1969, complaining of lower abdominal pains and "increased dyspareunia" (pain during coitus or copulation) and giving him a long surgical and medical history.[1]

1. *Surgical*—In 1949 when 18 years of age and complaining of "low abdominal pain," she had at Poplar Bluff, Missouri, a right ovarian cystectomy for removal of a cyst. Some two years later, she began to have low abdominal pain again and in 1954 at St. Louis County Hospital she had a right salpingo-oophorectomy (removal of right ovary and its Fallopian tube) and adhesiolysis (cutting or division of adhesions). Again complaining of low abdominal pains, some three months later in 1955 at St. Louis County Hospital she had a presacral neurectomy ("resectioning nerves" to decrease pain). *Medical*—In 1960 she consulted and was treated by Dr. Popp (otherwise unidentified) for her then complaints of nausea, gastric pains and dyspareunia. In 1962 complaining of low abdominal pain and

On this first visit, defendant prescribed an antibiotic, a tranquilizer and some "pain pills" and asked plaintiff to return in two weeks. Although she did not visit defendant's office again until "around" June 20, both she and her husband had, in the meantime, called defendant at home at "different times of the days and nights." After plaintiff had reported on this second office visit that she was feeling worse and defendant had completed another examination, his recommendation of a hysterectomy was accepted by plaintiff; and on July 9, 1969, defendant performed that operation at Missouri Delta Community Hospital in Sikeston.

In the course of that operation, defendant accidentally and unintentionally made a small laceration "about two centimeters . . . a little less than one inch" in length in plaintiff's bladder. This was assigned as a ground of negligence in plaintiff's first amended petition upon which she proceeded to trial, but she did not in the circuit court, and does not here, rely upon that ground. This course was, no doubt, dictated by the depositional testimony of plaintiff's sole medical witness, M. Richard Carlin, M.D., a St. Louis urologist who had never examined or attended plaintiff. As Dr. Carlin explained, the bladder and the uterus lie "in close proximity" to each other, with the bladder "in front or closer to the abdominal wall" and the uterus "immediately behind it." Accordingly, it is essential to separate the bladder from the uterus in order to remove the latter, and such separation becomes more difficult where, as in the situation under considera-

tion, the surgeon encounters adhesions, i.e., "scars, sometimes rigid and firm and sometimes filmy and soft, which often go from one organ to the next, and attach them when they might not ordinarily be attached." Dr. Carlin agreed that a surgeon opening the lower abdomen of a woman, who had undergone previous abdominal operations as had plaintiff, "would almost certainly find" adhesions, stated that "the bladder is damaged or opened or entered during . . . a hysterectomy not commonly, but not infrequently—it is not a rare situation," and acknowledged on cross-examination that he "did not consider [it] negligence to rent or cut a bladder where there are adhesions or fibroids."

Hence, plaintiff's trial complaints were confined to her postoperative care, and more particularly to postoperative drainage of her bladder, concerning which both plaintiff's depositional witness Carlin and defendant Cejas, called to the stand during plaintiff's case, were examined in minute detail. During the surgical period, plaintiff's bladder was drained by a size 16 Foley catheter inserted through the urethra;[2] and before closing the abdominal incision defendant sutured the bladder laceration and, by testing with a clear saline solution, "proved there was no leakage." In keeping with Dr. Carlin's and defendant's testimonial accord that, where there has been a bladder laceration, postoperative drainage of the bladder is essential, defendant provided for postoperative drainage of plaintiff's bladder through two catheters, namely, the size 16 Foley catheter through the urethra (the urethral catheter) and a larg-

---

constant aching which was worse when she was standing, she consulted and was examined by Dr. Page (otherwise unidentified) whose diagnosis was chronic cervicitis and a probable tubal blockage (i. e., that a tube was infected, not functioning properly, and therefore causing pain), and who also found an infection in the mouth of the womb. In 1963, she had a lumbar strain with backaches. In 1965 when she underwent unrelated eye surgery, she had cystograms (radiographic pictures of her bladder) and IVPs (intravenous pyelograms of kidneys and ureters) and was noted to have a skin rash. In 1967 she was involved

in an automobile accident, thereafter complained of "pains in the neck and headaches," and was treated by Dr. Tull at Ferguson Medical Clinic at regular intervals until November 16 on which date the medical record showed she "has settled her claim" and "is improved" but "continues to have some neck pains and headaches" and "is to return in one month." However, "she didn't come back."

2. The canal from the bladder through which urine is discharged externally.

er size 24 Foley through the abdominal incision (the suprapubic catheter).

Defendant and Dr. Carlin also were of like mind that the postoperative drainage following surgery involving a bladder laceration should be continuous and adequate to minimize the danger of development of a vesicovaginal fistula,[3] such as that which eventually developed following plaintiff's hysterectomy and spawned this litigation. For the purposes of this opinion, a brief summary of the evidence concerning postoperative drainage will suffice. Pursuant to defendant's orders as reflected in the hospital chart received in evidence, (a) both catheters were irrigated with 50 cc of saline twice each day, (b) for 48 hours postoperatively plaintiff's "input of liquids" and her "output or urine" through the catheters into a bag below were monitored and checked each hour to determine whether the catheters were open and draining properly, and (c) thereafter such input of liquids and output into the bag below were checked by the nurses on each shift and by defendant twice each day. On the third and the fifteenth postoperative days, the urethral catheter then in use (which on those days mayhap became "plugged") was replaced with another. The suprapubic catheter was removed on July 21, the twelfth postoperative day, but the urethral catheter remained in place until July 30, the twenty-first postoperative day. Dr. Carlin agreed with defendant that the use of two catheters afforded "a safety valve factor—if one doesn't work, the other one will—if one works properly, well, you don't need the other one." Defendant stated that the suprapubic catheter

was never obstructed, and there was no showing to the contrary.

As to whether or not there was urinary leakage outside the catheters, plaintiff's testimony ran along this line: "I was leaking urine . . . . I don't know where. They told me from around the catheters . . . . I am talking about catheter number two [the urethral catheter] leaking . . . . [I]t was constantly. What I mean it didn't just constantly leak. It did off and on, but at times it did wet . . . ." Plaintiff also stated that she had urinary leakage "on the way home" from the hospital on August 2 and thereafter. On the other hand, defendant said that, as shown on the hospital chart, there was no evidence of leakage outside the catheters while plaintiff was in the hospital. However, after extensive tests and x-rays some weeks later (plaintiff thought "around" August 25 or 26) defendant confirmed the existence of a vesicovaginal fistula, which subsequently was repaired surgically in a St. Louis hospital by Dr. Morris Abrams to whom defendant had referred plaintiff for that purpose.

■ Of course, no presumption that defendant was negligent in the postoperative care of plaintiff might have been indulged simply because of an unfortunate or adverse result [Swope v. Printz, 468 S.W.2d 34, 39(5) (Mo.1971); Hart v. Steele, 416 S.W.2d 927, 931(3), 37 A.L.R.3d 456 (Mo. 1967)]; and the burden rested upon plaintiff to prove not only (a) that defendant was negligent but also (b) that such negligence caused the injury for which plaintiff seeks to recover.[4] Swope v. Printz, supra,

---

3. An abnormal duct or passage from the bladder to the vagina.

4. When this case was tried in 1972, proper determination of these issues depended upon whether or not defendant had used "that degree of skill and learning ordinarily used under the same or similar circumstances by the members of defendant's profession in good standing practicing in similar localities." MAI No. 11.06, Missouri Approved Jury Instructions (2nd Ed.), p. 89. After the critique

in Gridley v. Johnson, 476 S.W.2d 475, 481–483(5) (Mo.1972), a modified MAI No. 11.06, deleting the closing limitation "in good standing practicing in similar localities," was adopted on December 19, 1972, for use on and after July 1, 1973. See Missouri Approved Jury Instructions (2nd Ed.), 1973 pocket part, p. 36. However, this deletion would have been of no significance upon trial of the case at bar, for the testimony of plaintiff's sole medical witness was in no wise restricted by the foregoing limitation then in effect.

468 S.W.2d at 39(6); Fisher v. Wilkinson, 382 S.W.2d 627, 630(3) (Mo.1964). As plaintiff's counsel have recognized, a submissible case on those issues could have been made only by expert medical testimony [Hart v. Steele, supra, 416 S.W.2d at 931–932(7, 8); Williams v. Chamberlain, 316 S.W.2d 505, 511(6) (Mo.1958)]; and to supply that indispensable showing they have relied solely upon the depositional testimony of Dr. Carlin, to which we again turn.

■ Dr. Carlin's testimony was prolix, diffuse, generously flecked with comments and statements not altogether consistent or fairly reconcilable with others in his deposition, and liberally interspersed with views and opinions which were hedged, equivocal or uncertain in nature and pedagogical in tone. Insofar as such opinions were sought with respect to the situation in suit, they were predicated upon a seven-page linguistic portrayal by plaintiff's counsel of a "hypothetical factual situation." In that hypothesization, counsel included *some* of defendant's postoperative orders concerning *irrigation* of the two catheters and *drainage* of plaintiff's bladder but significantly made no reference, inter alia, either to the hourly monitoring of "input of liquids" and "output of urine" for 48 hours postoperatively or to the subsequent check by the nurses on each shift and by defendant twice each day. (All emphasis herein is ours.) While recognizing that it is not absolutely essential that a hypothetical question should include all material facts in evidence, we are also mindful that a question of this character must fairly hypothesize the material facts reasonably relevant to, and justly presenting, the questioner's theory of the case, so that an answer of assistance to the jury in proper determination of the case may be elicited. Huffman v. Terminal R.R. Ass'n of St. Louis, 281 S.W.2d 863, 870(9) (Mo. 1955); Hunter v. St. Louis Southwestern R. Co., 315 S.W.2d 689, 696(6) (Mo.1958); Gavan v. H. D. Tousley Co., 395 S.W.2d 266, 270(7) (Mo.App.1965). In the situation under consideration, maintenance of adequate urinary drainage was the very essence of postoperative care; and in our view of the evidence the "hypothetical factual situation" depicted by plaintiff's counsel, upon which Dr. Carlin's opinions were elicited, was substantially and materially incomplete and inadequate in the aforementioned omitted particulars, and the objections of defendant's counsel on this ground were well-taken and should have been sustained. However, we need not and do not rest our determination of the appeal upon this evidentiary deficiency and error.

Careful consideration of the entire record, including the testimony of Dr. Carlin predicated on deficient hypothesization, leaves us in grave doubt as to the submissibility of plaintiff's case on the first element essential to recovery in a malpractice case, i.e., that defendant was guilty of negligence; but, eschewing substantial and supererogatory expansion of this opinion by the detailed review and analysis of Dr. Carlin's testimony which might be regarded as an appropriate, if not essential, precursor of a firm holding on the issue of defendant's negligence vel non, we pass to the second essential element upon which the case was ruled in the trial court and is briefed here, i.e., causal connection between the negligence charged against defendant and the vesicovaginal fistula for which plaintiff seeks to recover. The importance of this second element has been emphasized frequently, not only in malpractice actions [Swope v. Printz, supra, 468 S.W.2d at 39(6); Fisher v. Wilkinson, supra, 382 S.W.2d at 630(3); Williams v. Chamberlain, supra, 316 S.W.2d at 511(4)] but also in other categories of negligence cases, where the principle is often phrased thus: "The mere fact that injury follows negligence does not necessarily create liability. A causal connection must be established between the negligence charged or submitted and the loss or injury sustained, such that the injury would not have happened but for the negligence, and also that the negligence was not only a cause but was a proximate cause." Branstetter v.

Gerdeman, 364 Mo. 1230, 1237, 274 S.W.2d 240, 245(2) (1955); King v. Ellis, 359 S. W.2d 685, 688(4) (Mo.1962); Brassfield v. Sears, 421 S.W.2d 321, 325 (Mo.1967); Knollman v. Kennedy, 429 S.W.2d 775, 779 (Mo.App.1968).

To support their contention that plaintiff's case was submissible on the issue of causation, her counsel rely on the following statements winnowed out of Dr. Carlin's extended deposition:

(1) In response to the inquiry, "do you have also an opinion as to whether or not the care and treatment rendered by the doctor in the manner in which I told you, now, in the hypothetical question, *significantly increased the chances* for a vesicovaginal fistula to occur," Dr. Carlin answered "I would say that it did."

(2) Near the end of a twice-interrupted answer to a page-long question again requesting his opinion as to whether or not the vesicovaginal fistula would have occurred "had the doctor in the [seven-page hypothetical question theretofore framed by plaintiff's counsel] done" several things posed by plaintiff's counsel, the witness opined that *"it would have been far less likely* that this patient would have developed a fistula in the postoperative period."

(3) Immediately following the last-quoted statement, counsel sought an opinion as to whether "the fistula would have not either [sic] occurred or would have healed itself without need for surgical repair had, in fact, the surgical care as you have described would have been different and would have conformed with the accepted form of practice as you have described it." Being pressed for "just your opinion" after having told counsel he could not answer the question "in an absolutely dogmatic way because it is a theoretical question," Dr. Carlin said *"it seems to me . . . it would have been far less likely* for this fistula to have occurred if proper surgical closure and drainage had been instituted, *far less likely, or let me put it another*

*way, one would not expect a fistula to occur."*

■ Of course, a witness' testimony, which (as here) is not inherently self-contradictory, must be considered as an integrated whole. Dimond v. Terminal R.R. Ass'n of St. Louis, 346 Mo. 333, 353, 141 S.W.2d 789, 799(12) (1940); Edwards v. Springfield Coca-Cola Bottling Co., Inc., 495 S.W.2d 489, 495 (Mo.App.1973); Garrard v. State Dept. of Public Health & Welfare, 375 S.W.2d 582, 592(25) (Mo. App.1964). So, in considering the meaning, force and effect of the three above-quoted statements, we also have in mind the ready agreement of Dr. Carlin with defendant's counsel on cross-examination that a vesicovaginal fistula can develop where there is proper drainage and the doctor's voluntary statement that a fistula of this character "occurs from injury to the bladder." And we recall that the injury to plaintiff's bladder was the small laceration accidentally and unintentionally made by defendant—an injury, the occurrence of which, as we have noted, Dr. Carlin did not regard as negligent in view of the adhesions in plaintiff's abdomen.

Plaintiff's counsel here emphasize that the quoted statements of Dr. Carlin in the three above-numbered paragraphs were in response to questions initiated with the phrase "based upon a reasonable degree of medical certainty and your experience"—a shibboleth frequently (and often appropriately) employed by counsel in medical malpractice cases. However, the simple intonation of that phrase in a question does not transmogrify into reasonable certainty substantive portions of an answer plainly reflecting and denoting uncertainty. In the case before us, introduction of counsel's questions with the above-quoted phrase could not be said fairly to have done more than to affirm as a matter of reasonable medical certainty that the care and treatment in the "hypothetical factual situation" (inadequately) depicted by plaintiff's counsel "significantly increased the chances" of a vesicovaginal fistula and

that, as Dr. Carlin hedgingly and uncertainly stated, "it seems to me . . . it would have been far less likely . . . or let me put it another way, one would not expect a fistula to occur" if the postoperative care had been somewhat different. In short, as a matter of medical certainty the witness simply offered uncertain opinions.

In support of their position that the above-quoted uncertain opinions presented a submissible case on the essential issue of causal connection, *plaintiff's* counsel cite three malpractice cases, to wit, two in which physicians were charged with negligence [Rauschelbach v. Benincasa, 372 S. W.2d 120 (Mo.1963); Steele v. Woods, 327 S.W.2d 187 (Mo.1959)] and a third in which a dentist was charged [Nevinger v. Haun, 197 Mo.App. 416, 196 S.W. 39 (1917)]; three vehicular collision cases [Miller v. Fink, 387 S.W.2d 173 (Mo.App. 1965); Cluck v. Snodgrass, 381 S.W.2d 544 (Mo.App.1964); Phillips v. Stockman, 351 S.W.2d 464 (Mo.App. 1961)]; 61 Am.Jur.2d Physicians, Surgeons, Etc. § 210, p. 347; and Annot. 13 A.L.R.2d 11, 28 (1950). In his brief, *defendant's* counsel offers us under a single sweeping statement a conglomerate heap of seventeen cases, all of which we nevertheless have reviewed and thereby discovered that two were cast into the middle of the heap in support of the contention (heretofore noted as meritorious) that the "hypothetical factual situation" presented by plaintiff's counsel to Dr. Carlin was substantially and materially incomplete and inadequate [Hunter v. St. Louis Southwestern Railway Co., 315 S.W.2d 689 (Mo.1958); Gavan v. H. D. Tousley Co., 395 S.W.2d 266 (Mo.App.1965)] and that, when sorted out, the *remaining fifteen cases* (each in some respect dealing with a question of causal connection) included nine medical malprac-

tice actions,[5] two vehicular collision cases [Harrison v. Weller, 423 S.W.2d 226 (Mo. App.1967); Gulley v. Spinnichia, 341 S. W.2d 301 (Mo.App.1960)], three workmen's compensation cases [Anderson v. Parrish, 472 S.W.2d 452 (Mo.App.1971); Brandt v. E. O. Dorsch Elec. Co., 400 S. W.2d 452 (Mo.App.1966); Welker v. MFA Central Co-operative, 380 S.W.2d 481 (Mo.App.1964)], and one common-law damage suit by an employee against his employer [O'Leary v. Scullin Steel Co., 303 Mo. 363, 260 S.W. 55 (banc 1924)].

But generous in number as these offerings in the briefs undoubtedly are, they collectively constitute no more than a minuscule fragment of the vast agglomerate of reported cases in this jurisdiction which have considered some question of causal connection. In an extensive sampling and review of this agglomerate by examination of literally scores of cases drawn therefrom, we have spent, or rather misspent, an inordinate and disproportionate measure of time and effort before being driven reluctantly to the conclusion (in our view inescapable) that the innumerable cases dealing with causal connection defy logical classification or complete reconciliation. However, our frustration is somewhat assuaged by the discovery that, in introducing his discussion and review of "Causation," a distinguished writer and recognized authority in this area has commented that "[t]here is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion." Prosser, The Law of Torts (3rd Ed.) § 41, p. 240.

Reverting to our specific problem, no case has been cited by counsel or found by us involving the significance and effect of language analogous to that upon which instant plaintiff necessarily and admittedly

---

5. Fisher v. Wilkinson, 382 S.W.2d 627 (Mo. 1964); Rauschelbach v. Benincasa, 372 S.W. 2d 120 (Mo.1963); Williams v. Chamberlain, 316 S.W.2d 505 (Mo.1958); Pedigo v. Roseberry, 340 Mo. 724, 102 S.W.2d 600 (1937); Null v. Stewart, 78 S.W.2d 75 (Mo.1934); Krinard v. Westerman, 279 Mo. 680, 216 S.W. 938 (1919); Morgan v. Rosenberg, 370 S.W. 2d 685 (Mo.App.1963); Hilton v. Mudd, 174 S.W.2d 31 (Mo.App.1943); Sontag v. Ude, 191 Mo.App. 617, 177 S.W. 659 (1915).

depends, i.e., "significantly increased the chances" and "it seems to me . . . it would have been far less likely . . . or let me put it another way, one would not expect a fistula to occur." And, bearing in mind that every reported opinion should be read in the light of the facts of that particular case [State on Inf. of Dalton v. Miles Laboratories, Inc., 365 Mo. 350, 364, 282 S.W.2d 564, 573(12) (banc 1955); Citizens State Bank of Nevada v. Wales, 469 S.W.2d 750, 758(6) (Mo.App. 1971)], we are satisfied that none of the cases cited in the briefs before us dictate or indicate the proper determination of the present appeal. But this is not unique for no two situations are molded in precisely the same factual image; and it is as true with respect to an issue of causal connection [Dickerson v. St. Louis Public Service Co., 365 Mo. 738, 286 S.W.2d 820, 824(2) (banc 1956); Phillips v. Stockman, supra, 351 S.W.2d at 475] as it is with respect to other issues [Kollmeyer v. Willis, 408 S. W.2d 370, 380(13), 27 A.L.R.3d 332 (Mo. App.1966); Levee Dist. No. 4 of Dunklin County v. Small, 281 S.W.2d 614, 618(12), and cases collected in note 2 (Mo.App. 1955)], that each case must rest and be ruled on its own particular facts, with an eye single to the primary and overriding purpose of all litigation which is, simply and succinctly stated, to do justice. Donnell v. Vigus Quarries, Inc., 457 S.W.2d 249, 253 (Mo.App.1970); Kollmeyer v. Willis, supra, 408 S.W.2d at 381.

■■ The question of whether the evidence in a given cause is substantial, so as to permit and justify submission to the jury, is a question of law for the court. Gibson v. Newhouse, 402 S.W.2d 324, 328(9) (Mo.1966); Probst v. Seyer, 353 S.W.2d 798, 802(3), 91 A.L.R.2d 1252 (Mo.1962); Graham v. Conner, 412 S.W. 2d 193, 203(20) (Mo.App.1967). Where, as here, the testimony of a witness, even though not altogether consistent, is not inherently contradictory [Superior Loan Corp. of Buffalo v. Robie, 476 S.W.2d 144, 148(2) (Mo.App.1972); Kestner v. Ja-

kobe, 446 S.W.2d 188, 194 (Mo.App.1969)], it must be considered as an integrated whole. Dimond v. Terminal R.R. Ass'n of St. Louis, supra, 346 Mo. at 353, 141 S.W. 2d at 799(12); Edwards v. Springfield Coca-Cola Bottling Co., Inc., supra, 495 S. W.2d at 495; Allstate Ins. Co. v. Hartford Accident & Indem. Co., 486 S.W.2d 38, 46(7) (Mo.App.1972); City of Ash Grove v. Davis, 418 S.W.2d 194, 202(8) (Mo. App.1967); 32A C.J.S. Evidence § 1031(1), l.c. 690. When the testimony of Dr. Carlin is so considered, with appropriate regard for the fact that much of it was predicated upon incomplete and deficient hypothesization of the facts, and that the statements of Dr. Carlin in the three above-numbered paragraphs plainly reflected uncertainty [cf. Bertram v. Wunning, 385 S.W.2d 803, 807(4) (Mo.App.1965)], we are moved to the firm conclusion that a submissible case on the essential element of causal connection was not made.

Accordingly, the judgment for defendant is affirmed.

HOGAN, C. J., and TITUS and BILLINGS, JJ., concur.