**Columbia S. PETERS, Henry N. Davis, Nellie E. Blankenship, Monroe L. Davis, Rosa B. Payne, Mae Warrick, Bertha Thomas, Lee L. Davis and Luther E. Davis, Appellants,**

**v.**

**Beulah Dean DODD and Rayma Chloe Yeoman, Respondents.**

No. 47042.

Supreme Court of Missouri,

Division No. 1.

Nov. 9, 1959.

Clyde Rogers, Gainesville, for appellants.

James E. Curry, Ava, Fred A. Brooks, Horace S. Haseltine, Harold T. Lincoln, Lincoln, Lincoln, Haseltine, Forehand & Springer, Springfield, for respondents.

HOUSER, Commissioner.

Plaintiffs, surviving brothers and sisters of Charles E. Davis, deceased, brought this action to establish a lost will by the terms of which decedent is claimed to have bequeathed $100 to each of his two daughters and to have willed to his brothers and sisters the residue of an estate inventoried at more than $71,000. Defendants are the two daughters. A trial jury rendered a verdict against the proposed will. Plaintiffs have appealed from the ensuing judgment.

The only points raised on this appeal relate to the admission and exclusion of evidence. A résumé of the issue tried and a brief picture of the factual background is essential in order properly to appraise the propriety of the action taken by the trial court when various items of evidence were offered.

The principal issue tried was that of revocation, i. e., whether the last will and testament of the decedent executed in September 1944 was intentionally revoked by testator, as defendants contended, or whether it remained in force and effect until his death and was merely misplaced or lost, as plaintiffs maintained.

In 1943 and 1944 Charles E. Davis, referred to in the transcript and hereinafter as "Charlie," had domestic difficulties with

his wife, culminating in the trial of two actions, one for separate maintenance and another for divorce. His daughters, Beulah and Rayma, testified in favor of their mother and against their father at these trials. Charlie became very angry at and bitter against his daughters. Shortly after the divorce trial Charlie employed a lawyer to draft a will leaving each of the daughters $100 and the residue of his estate to Charlie's nine brothers and sisters. The lawyer prepared the will as instructed. He sent the original will to Charlie, one carbon copy to General Rogers and the other carbon to Willis Mitchell. Charlie properly executed the will, with two attesting witnesses, in September 1944. Thereafter there was no direct communication between Charlie and his daughters for years. In 1949 daughter Rayma and her husband, residents of Nebraska, drove to Springfield, Missouri where Charlie then lived, and spent Thanksgiving Day with him. They made subsequent visits to his home in December 1949, October 1950 and Christmas 1951. Charlie visited in Rayma's home in Omaha in September 1951. During these visits Charlie exhibited a very affectionate feeling for Rayma. They corresponded from 1949 to 1952 and exchanged Christmas cards. In 1952 a letter written by Charlie and dispatched to Rayma was lost in the mails. Thinking that her last letter had gone unanswered she did not write him again. In 1953 Rayma was the victim of an automobile accident in which she received severe injuries. Neither Rayma nor her husband notified Charlie of this fact. He learned of it through other persons. Between May 1955 and the date of his death (August 25, 1955) Charlie was in a Springfield, Missouri hospital on three occasions. Rayma, who in the meantime had moved from Omaha to Ava, Missouri (60 miles from Springfield), went to visit her father upon learning that he was in the hospital. During his first stay in the hospital she visited him two or three times a day. From 1944 to 1955 there had been no direct communication between Charlie and his daughter Beulah. In May 1955 at Charlie's suggestion Rayma called Beulah, a resident of Tulsa, Oklahoma to tell her of her father's hospitalization. Beulah returned the call to the hospital, was informed that Charlie's condition was not serious. In June 1955 (between hospital stays) Charlie called Beulah on the telephone on two different occasions. This was the first contact between Charlie and Beulah since 1944. Beulah's telephone number was written on Charlie's telephone pad in his handwriting. On June 16, 1955 Charlie directed a note to the bank officials authorizing them to enter his lockbox and remove three $1,000 bonds which he wanted to cash in order to pay his hospital expenses. Charlie told Rayma where to find the key to the lockbox. A search was made and the key was found. Rayma presented the note and key to the vice president and cashier of the bank, who entered the box, removed the bonds and delivered them to Rayma. Rayma did not touch the lockbox or its contents. She delivered the bonds to her father, who endorsed them and then deposited them to his account. When Charlie was released from the hospital the second time Rayma's physical condition (she was still suffering from the results of a very serious automobile accident which occurred in 1953) was worse. She was under a doctor's care. Charlie called Rayma on the telephone during this period. She next saw her father at the hospital on August 23. Advised that he would be out of the hospital in ten days she returned to her home in Ava. The next day she received a call that he had taken a turn for the worse. She returned to the hospital as fast as she could, and remained with him until his death on August 25. On August 24 Beulah learned that her father was again in the hospital, whereupon she and her husband travelled from Tulsa to Springfield. Upon arrival Beulah went to her father's hospital room where she remained with him until his death early the following morning.

There was conflicting evidence as to Charlie's statements and declarations between 1944 and 1955 with reference to the

continued existence of the will and the state of his affections toward his children and to his brothers and sisters.

*Proponents' evidence as to testator's declarations:* On April 16, 1948, when he became a Scottish Rite Mason he signed a statement, "I have a will prepared—now located in my safe at home, Ava, Missouri." On August 3, 1948 he took the will to the Citizens Bank of Ava. On March 7, 1945 he told two of his sisters that he had made his will, informing his sister Bertha that he had left his property to his brothers and sisters. In 1952 he told Bertha that his will "stood as was." In 1953 he told Bertha that he had provided his daughters with enough to live on and that he didn't intend for them to spend any more of his money. In 1950 and 1953 Charlie told his sister Rosa that he had made his will. Twice in 1953 he told Willis Mitchell that the daughters were not going to get any more than they had already got. At an unspecified date he told his brother Monroe that he was "going to" make his will; that he didn't aim for the girls to have any more than just enough to comply with the law, and aimed for his brothers and sisters to have the balance. In 1954 Charlie told his brother Henry that he was going to provide for his brother Luther in his will; that he was going to defray his doctor bill and funeral expenses. In 1955 he told his sister Columbia that his money "will be there for you kids when I'm dead and gone." In 1954 Charlie told Ranse Gaston that he had a will. In April 1955 Charlie told Gaston that at one time he thought there was a chance for him and his daughters "to make up"; that once his daughter Rayma, on the way to visit her mother, had visited him and had promised to stop by his house on the way back but that Rayma had not stopped on her return, and that he thought Rayma's mother had poisoned her mind against him. Charlie told his housekeeper that he had a will in the Ava bank. In August 1955, while in the hospital, Charlie told Iva Gorthey, " 'I had two daughters that I tried to help but they don't pay me no mind what-soever, so I have made my will to my brothers and sisters, which you see the brother comes here every night and takes care of me.' " Brother-in-law Albert testified that the Saturday before he died Charlie told him that he had let Rayma have the key to his box in the bank; that he might have made a mistake because " 'they are awful careless there at the bank' "; that Willis Mitchell and General Rogers had copies of his will if it was not found in the deposit box, but not to say anything about it "until they find no will."

*Contestants' evidence as to testator's declarations:* On September 1951 Charlie told Rayma that since she was an epileptic she could never work and take care of herself; that it was his duty as her father to take care of her as long as she lived; that he knew her husband could not get insurance because of a heart condition and that he wanted the three of them (father and two daughters) to spend his money and be together the rest of his life; and he wanted to know if she would accept money from him if she ever needed it. In December 1949 Charlie told Rayma's husband, Kay, that he knew he had done several things wrong but he intended "to make it up" to Rayma. Kay told Charlie he heard a rumor that Charlie had disinherited Rayma, to which Charlie answered, " 'Oh, no, that is not true. That has been changed.' " Charlie offered Rayma and her husband financial assistance, saying " 'All you have to do is just ask for it.' " In 1950 he told S. R. Wallen that he tore up or destroyed his first will in which he had "left Beulah out. * * * I destroyed that and wrote another one." After Rayma's accident in 1953 Charlie told Kay he wanted to be of assistance; that if they needed to they could ask for his help. Charlie told Rayma's father-in-law that he loved his girls with all his heart; that if there was anything in the world Rayma needed he wanted her to have it, " 'because everything in the world that I have is at her disposal if she needs it.' " Gladys Stewart, a lawyer, testified that she had conversations with Charlie through the

years; that following the divorce he expressed bitterness and resentment but that during 1951, 1952 and 1953 there was a decided change in his attitude toward his daughters; that in a conversation with Charlie prior to 1953 he stated that he had not done the right thing when he had his will drawn; that he had done it when he was very mad at his ex-wife and the girls; that he asked her, " 'Is it all right to tear up a will?' "; that in 1953 he expressed great satisfaction that the hard feelings between him and his children were over and that he felt at peace; that he reminded the witness that she had told him that it was all right to tear up a will and asked, " 'It's all right that I tore up the will?' " He further told the witness that after he was gone his daughters would have the money to travel; that " 'they will have what I have got.' " He told Stella Lantz that he had made a will " 'to his brothers and sisters and children' "; that he made that will in a fit of anger after the court proceedings in 1944; that he loved his children and was sorry for what had happened; that he had made a mistake; that because some of his brothers had caused him to have to "pay off" their expenses and had failed to repay loans he had changed his mind about his will and was " 'leaving them out of it, instead of giving them a part, I am going to give it all to my daughters.' " In 1952 he told the witness that he had destroyed his first will and had made a new will to his daughters. In 1954 he made a loan to the witness' husband. He required that a note be executed so that " 'if anything happens to me it will go to my daughters * * *.' " In the hospital he told one nurse about how good and pure and nice his daughters were and expressed no bitterness toward either of them. Another nurse testified that Charlie told her about what sweet little girls they were in their schooldays, and that he said, " 'When I am able to get out of here I intend to make a will and see that my daughters get everything that I have.' "

An inventory of the contents of Charlie's safe included: Rayma's measurements; a key to the lockbox; a letter from Beulah to Charlie; a bag of old coins Beulah collected as a child; a boxed and wrapped gift to Rayma with a notation "Christmas, 1952"; two equal stacks of church bonds; an American Telephone & Telegraph Company check payable to Charlie and Rayma dated July 11, 1955; two certificates of common stock of the American Telephone & Telegraph Company dated February 4, 1953, each for fifteen shares, one in the joint names of Charlie and Beulah and the other in the joint names of Charlie and Rayma, both certificates providing for the right of survivorship. Letters written by Rayma to Charlie were found in his desk. On his desk there was a telephone pad on which he had written Beulah's telephone number. There were war bonds and bank stock in the lockbox. In Charlie's billfold a card was found on which was written the combination to his safe, and the following, in Charlie's handwriting: "My will is in lock box at bank, Ava, Mo. Keys to lock box. One in safe. One in glove compartment of car." A thorough search was made of Charlie's effects but no will was found. When he learned that the original will could not be found brother-in-law Albert visited the office of General Rogers and obtained a carbon copy of the will, which was offered for probate. This suit was filed when the probate court refused to establish the document as a lost will.

■ Appellants claim prejudicial error in admitting evidence that Charlie took title jointly with his daughters to the American Telephone & Telegraph Company stock, contending that this evidence was not relevant and did not tend to prove that testator had revoked his will or that he intended to make or had made another will; that it was confusing and could have caused the jury to believe "that he had changed his attitude toward his daughters, and by leaving them his property in this manner had thereby revoked his will." If a duly executed will is shown to have been in the possession of the testator when last seen, and the will cannot be found after his death, the pre-

sumption, in the absence of other evidence, is that testator destroyed it with the intent to revoke it. McMurtrey v. Kopke, Mo. Sup., 250 S.W. 399; Hamilton v. Crowe, 175 Mo. 634, 75 S.W. 389; 57 Am.Jur., Wills § 549. Where the issue is revocation animo revocandi the courts receive evidence of oral declarations of the testator revealing the state of his mind or affection toward the beneficiaries named in the will, Hamilton v. Crowe, supra, or of his bitterness and dislike for the persons excluded from the testator's bounty. McMurtrey v. Kopke, supra. And see In re Willitt's Estate, N.J. Prerog.1900, 46 A. 519. On numerous occasions this court, in passing upon the admissibility or sufficiency of evidence to sustain a finding of revocation, has considered and accorded weight and value to, and has relied upon, evidence of the relationship shown to have existed between testator and the named beneficiaries in the will claimed to have been revoked, and the state of his feelings and affections for them, subsequent to the execution of the will. Hamilton v. Crowe, supra; Menzi v. White, 360 Mo. 319, 228 S.W.2d 700, 17 A.L.R.2d 796; McMurtrey v. Kopke, supra; Peterson v. Bledsoe, 362 Mo. 258, 241 S.W.2d 375. And see Charles v. Charles, 313 Mo. 256, 281 S.W. 417. For the same reasons it is proper to receive evidence of a gift of property, where the natural inference to be drawn from the making of the gift is that the testator thereby was expressing his feelings of love and affection, protection and care for the donee. Evidence that several years after the execution in anger of a harsh and unnatural will by which he cut off his daughters—the natural objects of his bounty—with a pittance, testator caused a substantial amount of valuable stock to be issued jointly in his name and the names of his daughters, is admissible on such an issue. Such evidence has a natural tendency to strengthen, fortify and reinforce the presumption. It sheds light upon the issue of revocation, helps the jury draw the inference that testator's feelings toward his children had changed; that his emotions of

dislike, anger and bitterness had been dissipated; that his children again were the objects of his affection and concern and that his feelings of responsibility for and charity toward them had been restored. Such a circumstance, revealing a complete change of attitude, renders greater the possibility that testator destroyed an unnatural will with intent to revoke its harsh provisions. The evidence was relevant and admissible and this point is ruled against the appellants.

▌ Appellants next claim prejudicial error in admitting testimony that Rayma suffered injuries in an automobile accident. It is argued that this testimony did not tend to prove revocation of the will but only tended to arouse sympathy for Rayma. In the accident (February 1953) Rayma sustained a fractured skull, a brain concussion, a broken neck, dislocated hip, dislocated shoulder, broken ribs and other injuries. For some time she "did not want anything to do" with her husband or any one. She had not recovered from the injuries at the time of her father's illness in May 1955. The evidence concerning the accident and injuries was admissible for several reasons. In the first place, that fact would support an inference that there was an additional reason for the testator to destroy his will with intent to revoke it (if in 1953 he had not already done so). Taken in connection with the testimony that in September 1951 Charlie had recognized Rayma's inability to work and care for herself because of her epileptic condition; that he had commented on his duty as her father to see that she was cared for and had expressed his concern for her financial situation, it would add some weight to the possibility that Charlie destroyed the unnatural will with intent to revoke it. Facts and circumstances which would motivate a testator to continue the existence of a will, as in McClellan v. Owens, 335 Mo. 884, 74 S.W.2d 570, 95 A.L.R. 711, and McMurtrey v. Kopke, supra, or to revoke a will, as in Peterson v. Bledsoe, supra, and Menzi

v. White, supra, are admissible in evidence. In the second place, the testimony was admissible to help explain the failure of Rayma to visit with her father between the time of the accident in 1953 and May 1955. In the third place, the testimony was relevant for consideration in connection with the testimony of E. L. Yeoman who testified that Charlie, upon learning that Yeoman had visited Rayma in the hospital in Tulsa following her injuries, travelled from Springfield to Ava in February 1953 to inquire of Yeoman as to her condition, expressing concern about the hospital expense and his desire to furnish her with money if she needed it; and that in September 1953 Charlie again talked to Yeoman about Rayma's condition, expressing concern, and repeating that anything he had was available to Rayma in case of need.

■ Appellants further claim prejudicial error in admitting evidence that Charlie in his own handwriting had written Beulah's telephone number on a pad; that it did not establish or disprove any issue in the case. This evidence was admissible in corroboration of Beulah's testimony that she and her father communicated by telephone in June 1955, and in support of an inference that Charlie was interested in Beulah at that time and was no longer bitter and vengeful toward her.

Appellants' next point is that the court erred in excluding certain testimony. At the close of defendants' evidence plaintiffs offered evidence in rebuttal as follows:

■ ■ (1) Plaintiffs placed Monroe Davis back on the stand and made the following offer of proof, which was refused: "It was testified by the witness, Rayma Yeoman, for the defense, that Charles E. Davis requested that she be called, and that in response to telephone calls from Charles E. Davis that Rayma visited him in the hospital. Now we offer to prove by this witness that the matter of calling his daughter, Rayma Yeoman, was suggested to him by this witness, Monroe Davis, and that

Charles E. Davis said to Monroe Davis, 'No, you need not call her; if she wants to come she will come.' " Appellants contend that this evidence would rebut and impeach testimony given by Rayma "that Charles E. Davis requested that she be telephoned concerning his condition, that she was called, and in response to the telephone call visited him in the hospital." Appellants did not give a specific page reference to the transcript where this testimony of Rayma is supposed to appear, as required by Supreme Court Rule 1.08, 42 V.A. M.S. Although there was no obligation on our part to hunt for it we nevertheless conducted a thorough search. We have been unable to find any such testimony by Rayma. There can be no error in excluding rebuttal testimony offered to rebut "testimony" that was never given in court.

(2) Plaintiffs placed Henry Davis back on the stand and made the following offer of proof, which was refused: "It was testified by a number of witnesses for the defendants that Charlie Davis had told different witnesses that he had destroyed his will and that he intended for his daughters to have everything he had, and we offer to prove by this witness that on the 20th day of October, 1954, which was a time later than the statements made by the witnesses saying he had destroyed his will, that Charlie Davis told this witness that his will stood as it was in 1949." Appellants contend that this evidence rebuts the testimony that Charlie said that he had destroyed his will and that he intended for his daughters to have everything he had, and was admissible to prove that Charlie had not revoked the 1944 will.

(3) Counsel for plaintiffs made the following "offer" without placing any witness on the stand: "In order to save time here, Judge, I believe it was the Pursselley woman, testified that he said that when he got out of the hospital he was going to leave his property to his daughters, or fix it so as to leave it to his daughters, or words to that effect. We have one witness here who will testify that thereafter he had a con-

versation with Mr. Davis in the hospital at which time he said that he was leaving all of his property to his brothers and sisters.

"The Court: The offer is refused. I think that is a part of your case in chief and could have been produced in your case in chief in support of your contention that the will was in existence."

 Items (2) and (3) were relevant and competent testimony on the principal issue of revocation. Had they been offered in plaintiffs' case in chief they would have been admissible. (Much of the same type of evidence was given by plaintiffs in the presentation of their case in chief). These items of evidence were not offered in plaintiffs' case in chief, however, but were offered in rebuttal, after the defendants had closed their case. These items did not constitute rebuttal evidence. Rebuttal evidence is evidence tending to disprove "new points first opened by" the opposite party. Christal v. Craig, 80 Mo. 367. A party cannot, as a matter of right, offer in rebuttal evidence which would have been admissible had it been offered in the case in chief, even though it tends to rebut or contradict the opposite party's evidence. 88 C.J.S. Trial § 102, p. 215. Items (2) and (3) were cumulative or confirmatory. " 'A plaintiff is not entitled as of right, on the stage of rebuttal, to the admission on his behalf of evidence merely cumulative or confirmatory of that already put in by him in his original case.' " Seibel-Suessdorf Copper & Iron Mfg. Co. v. Manufacturers' R. Co., 230 Mo. 59, 130 S.W. 288, loc. cit. 293. When evidence is thus offered out of order the trial court has a judicial discretion to admit or exclude it, Christal v. Craig, supra, " * * * and generally should, decline to permit either party to introduce evidence in support of his case in chief on rebuttal, especially on a subject fully covered in his case in chief, unless sufficient reason is offered for not introducing it at the proper time." 88 C.J.S. Trial § 102, pp. 215–216. Plaintiffs offered no reason or excuse for not offering these items in the regular course of procedure. The exercise of the trial court's discretion in such a matter will not be interfered with unless it has been clearly abused. Feary v. Metropolitan Street Ry. Co., 162 Mo. 75, 62 S.W. 452; Perry v. Missouri-Kansas-Texas R. Co., 340 Mo. 1052, 104 S.W.2d 332. We find no abuse of discretion in the instant situation and rule the point against appellants.

There is no error in this record and the judgment is affirmed.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.