Donald F. WILLSEY and Marjorie L. Willsey, Appellants,

v.

W. C. PORTER FARMS COMPANY, and W. C. Porter, Respondents.

No. KCD 27063.

Missouri Court of Appeals, Kansas City District.

March 31, 1975.

Sherwin L. Epstein, Steven J. Borel, Stubbs, Epstein & Mann, Kansas City, for appellants.

James H. McLarney, Kansas City, for respondents; Swanson, Midgley, Eager, Gangwere & Thurlo, Kansas City, of counsel.

Before SWOFFORD, P. J., and WELBORN and HIGGINS, Special Judges.

SWOFFORD, Presiding Judge.

This action is one in equity wherein the appellants (hereinafter designated "plaintiffs") sought a decree of specific performance of a contract to convey real estate, dated April 20, 1971, which contract is asserted to be valid and binding upon the corporate defendant and which it had failed to perform. The individual defendant, W. C. Porter, while named in the original suit, was dropped as a party by amended petition, and the trial proceeded as to the corporation only. The court below entered its decree for the defendant corporation and this appeal followed.

The plaintiffs raise only one point in their brief. They assert that the trial court erred in entering a decree for the defendants because the "weight of the evidence" demonstrated that plaintiffs were entitled to specific performance of the contract and the judgment was therefore "clearly erroneous". This point presents nothing for review and clearly violates the requirements of Rule 84.04(d), V.A.M.R., although it implies that there was *some* evidence to support the judgment of the court below so that it does not purport to raise the sufficiency of that evidence. Robbins v. Robbins, 328 S.W.2d 552, 556[7, 9] (Mo.1959); Nutz v. Shepherd, 490 S.W.2d 366, 369[4, 5] (Mo.App. 1973); Stanziale v. Musick, 370 S.W.2d 261, 265[2, 3] (Mo.1963); Shell-Con, Inc.

v. Architectural Concrete, Inc., 486 S.W.2d 662, 663–664[1, 2] (Mo.App.1972). However, as the plaintiffs' violation of this rule has not prejudiced the defendant corporation and the real controversy on this appeal is a single and simple issue which may be ascertained from the briefs and the title to the real estate is involved, this violation, while strongly condemned, will be disregarded in this case and the appeal will be decided upon its merits. Hans Coiffures International, Inc. v. Hejna, 469 S.W.2d 38, 38[1] (Mo.App.1971); State ex rel. Aimonette v. C & R Heating and Service Company, 475 S.W.2d 409, 412[1] (Mo. App.1971).

The determinative and decisive issue centers upon the authority of W. C. Porter to contract to convey real estate, the legal title to which was held in the name of the corporation of which he was president, without the approval of the board of directors and in the face of a prompt and definite disavowal and renunciation of such agreement by W. C. Porter and the board of such corporation. In deciding this issue, certain undisputed evidence should be noted.

The W. C. Porter Farms Company, at times pertinent here, is a Missouri corporation organized in January, 1967 to carry on the business of farming and all related activities. The principal capital assets of such corporation consisted of 560 acres of farm land near Blue Springs, Missouri, formerly owned by W. C. Porter and his wife Naomi M. Porter. Some of this land had been in the family for many years and he and his wife had acquired additional acres by purchase during their marriage. The Porters conveyed the 560 acres to the corporation in exchange for common stock. From time to time thereafter, shares of this stock were transferred by the Porters to their daughter, Harriett Copple, and her husband, William P. Copple, as gifts. However, before the formation of the corporation, the Porters and the Copples entered into a written agreement designating the responsibilities of each in the operation

of the proposed corporation. According to this agreement and the actual operation of the corporation's farming business between January of 1967 and April of 1971, when this controversy arose, the respective positions, duties and stock ownership of the members of the corporation can be briefly described as follows:

W. C. Porter is president of the corporation and a member of the board of directors and owned approximately 8 to 10 percent of the common stock. At the time of the trial, he was 80 years of age and had farmed all of his adult life. He managed the day-to-day farming operations but left the business affairs of the corporation to the other officers and directors.

Naomi Porter was vice president and a member of the board of directors and owned approximately 40 to 41 percent of the common stock. So far as the record discloses, she did not actively participate in the day-to-day affairs of the corporation but acted strictly as an officer and director. At the time of the trial, she was completely incapacitated, paralyzed and unable to speak. Her daughter, Harriett Copple, had been named her legal guardian prior to the trial.

Harriett P. Copple is secretary and treasurer and a member of the board of directors of the corporation and owned 40 percent of the common stock. Her duties consisted of keeping and maintaining the corporation's records, including books, income tax records, minutes of stock and directors' meetings and all stock and financial records.

William P. Copple was married to Harriett in December, 1961. He holds a degree in Agricultural Economics from the University of Missouri, is a member of or certified by various real estate appraisal societies, is employed by the United States General Services Administration as a staff appraiser, and also manages a farm owned by him and his wife near Trenton, Missouri. He has been a shareholder in the corporation since its formation and, at times pertinent here, owned approximately 10 percent of the common stock. He has done some manual work on the farm, such as planting and harvesting crops and handling livestock, but most of his efforts in behalf of the corporation were in an advisory capacity. He and W. C. Porter conferred about the farm approximately once a week, discussing crops, livestock, the Federal Feed Grain Program and real estate sales and development in the area.

The minute book of the corporation reveals that at a shareholders' meeting held January 5, 1971, a resolution was adopted authorizing the president (W. C. Porter) to "discuss with any prospective buyer the sale of" the 200 acres of the farm here involved "with any decision resulting therefrom to require the consent of the Board of Directors".

On April 15, 1971, the plaintiff, Donald F. Willsey, contacted W. C. Porter on the farm while he was working in the fields and entered into a discussion as to the sale of the 200 acres. As a result of this discussion, Mr. Willsey roughed out some notes as to terms of sale on a piece of tablet paper, which was signed "Donald F. Willsey—W. C. Porter". Mr. Porter testified that he made it clear to Willsey that the property was owned by the corporation and that any tentative agreement which they might reach was subject to the approval of the corporation shareholders and directors. Willsey was shown by the record to be possessed with wide experience in business and real estate matters and himself a member of a number of corporations.

He testified:

"Q. And at the time Mr. Porter also told you that the land was titled to a corporation?

A. I would say that's right.

Q. So it is fair to say that the land was owned by the corporation and the family was involved in this corporation?

A. Right."

As a result of this conversation between W. C. Porter and Willsey, the latter prepared the Real Estate Contract dated April 20, 1971, here sought to be enforced, which showed "W. C. Porter Farms Co." as seller, and the plaintiffs as buyers. This document was signed "W. C. Porter Farms Co.—W. C. Porter" and by the plaintiffs. Space was left for the signatures of the other corporate officials. The purchase price was in excess of $400,000.00.

Porter testified that when he had an opportunity to study the contract, it wasn't "at all like I thought it was" and did not reflect his tentative agreement with Willsey. When it was shown to the Copples (Naomi Porter does not appear to have personally entered into any phase of this transaction) a special meeting of the shareholders and directors of the corporation, with corporate counsel in attendance, was arranged and held on April 26, 1971, at which time a resolution was adopted specifically rejecting the terms offered by Willsey but authorizing counsel to make a counterproposal and further stating:

"Resolved, that the President is not authorized to bind the company to this or any other sale."

Willsey was advised of this decision by Porter via telephone and by a letter from counsel dated April 28, 1971, in which the tendered down payment under the Willsey contract was returned. Willsey in turn rejected the counterproposal from the company, and another special meeting of the shareholders and directors of the corporation was held on May 4, 1971 and Willsey's "counterproposal" was rejected and counsel was instructed to advise Willsey that "the company was not bound by any contract agreed to by the President".

■ Plaintiffs contend that W. C. Porter had both actual and apparent authority to execute the contract in question and thus bind the corporation. The voluminous record and exhibits before the trial chancellor have been carefully reviewed and do not support plaintiffs' position. It is true that W. C. Porter was given a free hand in the day-to-day management of the farming operations (the purpose for which the corporation was organized) with the advice and assistance of Mr. Copple. Within that area of the usual course of the corporate business, the record would support his authority to bind the corporation. The general rule is that a president of a corporation is empowered to transact, without special authorization from the board of directors, all acts of an ordinary nature which are incident to his office by usage or necessity and to thus bind the corporation. Stevens Davis Co. v. Sid's Petroleum Corporation, 157 S.W.2d 246, 249[7] (Mo.App.1942); Fair Mercantile Co. v. Union-May-Stern Co., 359 Mo. 385, 221 S.W.2d 751, 753[1] (1949). Such officer's actual authority stems from the statutes, articles of incorporation, by-laws and either specific authority from or longstanding acquiescence by the board of directors. Apparent authority "is brought into existence by the principal's creation of an appearance of affairs which would cause a reasonable person to believe that the officer had actual authority to do a particular act, upon which appearance a third person relies". Parks v. Midland Ford Tractor Company, 416 S.W.2d 22, 26[8, 9] (Mo.App.1967); Fair Mercantile Co. v. Union-May-Stern Co., supra.

■ W. C. Porter did not have actual authority to bind the corporation to sell approximately 35% of its farm land. The articles of incorporation, as above noted, limited the power of the corporation to "carrying on the business of farming and all related activities". Of course, its president could have been given authority to bind the corporation to sell the land. But no such authority had ever been conferred upon him. To the contrary, the directors had strictly limited his powers in this regard to discussing with any prospective

buyer the sale of the 200 acres "with any decision resulting therefrom to require the consent of the Board of Directors".

 Neither does this record support a conclusion that W. C. Porter was clothed with apparent authority within the above-stated rule. No other activity than farming had ever been carried on by the corporation so that the contract to sell the land would not be the usual and customary activity of the corporation. The corporate purpose was to farm, not to barter or trade in real property. Josephine Hospital Corportaion v. Modoc Realty Co., 307 Mo. 336, 270 S.W. 638, 641[2] (1925); Grafeman Dairy Co. v. Northwestern Bank, 315 Mo. 849, 288 S.W. 359, 362[1] (banc 1926); Roth v. J. N. Roth & Co., 363 Mo. 767, 253 S.W.2d 802, 806–808[3, 4] (1952); Grimm v. Gargis, 303 S.W.2d 43, 48[5] (Mo.1957). Furthermore, the record supports the solid conclusion that Willsey was advised that the land involved was owned by a corporation and that the approval of the other members of the corporation was necessary to validate the contract. While some of the testimony of W. C. Porter was somewhat vague and conflicts in some details with the testimony of Willsey, the inevitable conclusion from his testimony and that of the plaintiff, Donald Willsey, emerges that Willsey could not have been misled by appearances to believe that Porter could act alone in binding the corporation, particularly in the light of Willsey's extensive business background and admitted business knowledge. At most, he might have hoped that Porter had the necessary influence with the other corporate owners to secure their approval. However, such was not forthcoming and in fact Porter testified that the contract drawn by Willsey did not reflect his idea of the terms discussed, and he also voted to reject the proposal.

The case of Jones v. Williams, 139 Mo. 1, 39 S.W. 486, 40 S.W. 353 (Mo.1897), relied upon by plaintiffs, is clearly distinguishable upon the facts. The case of Parks v. Midland Ford Tractor Company,

416 S.W.2d 22 (Mo.App.1967), also cited by plaintiffs and cited supra herein, is completely consistent with and supportive of the conclusions here reached.

The judgment is affirmed.

All concur.