Clayborn Matthew WILSON, b/n/f Mary Wilson, Mary Wilson and Clay Wilson, Respondents-Appellants,

v.

Gary F. LOCKWOOD, M.D., et al., Appellants-Respondents.

Nos. WD 37075, WD 37071.

Missouri Court of Appeals, Western District.

May 27, 1986.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 26, 1986.

Thomas W. Wagstaff, James Bandy, Blackwell, Sanders, Matheny, Weary, & Lombardo, Kansas City, for Gary F. Lockwood.

James E. Patterson, Jr., and Max Von Erdmannsdorff, Von Erdmannsdorff & Zimmerman, Kansas City, for appellants/respondents.

Paul H. Niewald, Terry L. Karnaze, Niewald, Waldeck, Norris & Brown, Kansas City, for Hollister, Inc.

Before LOWENSTEIN, P.J., and TURNAGE and BERREY, JJ.

LOWENSTEIN, Presiding Judge.

The infant plaintiff brought this suit by his next friend, his mother, on a medical malpractice negligence theory against defendant-appellant Dr. Lockwood, who performed a circumcision on the child at defendant St. Luke's Hospital. The child's parents also brought a separate count against the doctor, the hospital and the manufacturer. In removing the foreskin, Dr. Lockwood used a Plastibell device manufactured by defendant Hollister, Inc. The device was supposed to fall off after eight days. However, it did not and as a result, the child was injured.

The hospital was sued in a count alleging negligence in failing to warn the parents of the risks involved. The count against Hollister sounded in strict products liability and negligence. The trial court granted St. Luke's and Hollister's motions for directed verdict at the close of plaintiffs' evidence. The Wilsons appeal these rulings. Dr. Lockwood appeals a jury verdict awarding $200,000 to the child and $100,000 to the parents, reduced by ten percent attributed to their fault. The Wilson's appeal as to St. Luke's and Hollister will be taken up first.

## THE DIRECTED VERDICTS FOR HOLLISTER AND ST. LUKE'S

As to whether plaintiffs made a submissible case, review is in light of the evidence and inferences most favorable to the plaintiffs. *Mercer v. Thornton*, 646 S.W.2d 375, 376 (Mo.App.1983). The evidence was Hollister makes five sizes of the Plastibell device. The doctor chooses the correct size. The device, a clear plastic ring, is positioned on the front end of the glans or tip of the penis. The foreskin is then retracted around the device and a ligature (surgical string) is looped around the foreskin covering the device and pulled tight. The tightening cuts off circulation to the foreskin above the ligature, and excess tissue above the ligature is then removed. The Plastibell device fits on the head of the penis like a cap, with the very tip of the glans exposed. Normally, the device falls off within five to eight days.

The child was born on February 15, 1983. Dr. Lockwood performed the circumcision on February 18, 1983. The Plastibell device had to be surgically removed on March 11, 1983. Apparently the device did not fall off but slipped onto the shaft of the child's penis where it became entrapped. The evidence was the device had a strangling effect on the shaft as the penis grew, making a circumferential scar. The expert testimony for the Wilsons was either the device used by the doctor was too large and slipped or the device was improperly positioned and excessive tension caused it to slip onto the shaft.

Prior to the circumcision, someone at the hospital gave the mother a brochure and told her the device would fall off by itself. The parents had consented to the circumcision. The Hollister brochure, complete with pictures, stated the following:

Now that your baby has been circumcised ...

1. The plastic rim usually drops off 5 to 8 days after circumcision. No special dressing is required, and the baby can be bathed and diapered just as if he had not been circumcised. NOTE: A dark brown or black ring encircling the plastic rim is

perfectly natural. This will disappear when the rim drops off.

2. The result is a clean, well-healed line of excision. Be sure to notify your doctor if healing does not proceed as he described. Notify him *immediately* if you should notice any unusual swelling, if the plastic ring has not fallen off within 8 days, or if the ring has slipped onto the shaft of the penis.

On February 19, the day the mother and child were released, the mother showed the instructions and photographs to the father. The mother had looked at the pictures and "glanced" at the instructions. The father read the instructions set out above. The mother said she knew the device was to fall off and was not to move onto the shaft. The Wilsons did not take the brochure home. Three days later the mother took the child to St. Luke's for tests totally unrelated to the circumcision.

After the eighth day the father and mother were "really antsy" because the device had not fallen off. They did not call Dr. Lockwood. They looked at the Plastibell ring every day starting about eight days after the circumcision. Approximately two weeks after the circumcision the father called St. Luke's. His testimony was the person he talked with told him not to worry about it since some devices stay on longer than others. By March 11, the device still had not fallen off. The child had not been sleeping or eating properly and cried constantly. The mother took the child to a pediatrician, who referred her to another doctor. On this date the device was surgically removed.

The result has been a grooved or depressed and discolored area on the penis. An examination afterwards by a Dr. Mani resulted in an opinion that plastic surgery was not presently recommended, and there was nothing functionally wrong with the child "at this stage." The doctor said as the child grew older, the "locker-room situation" may create psychological problems, and corrective surgery might then be necessary.

In their petition, the Wilsons claim the Plastibell device manufactured by Hollister was in a defective condition and unreasonably dangerous, causing a deformed and disfigured penis on the infant. They also claim Hollister negligently designed the device and provided confusing and inadequate instructions regarding use and application by medical personnel.

The only evidence as to Hollister's liability under any theory asserted by the Wilsons was the testimony of a Dr. Guthrie. He said it was difficult for a surgeon to select the proper size of the Plastibell ring. He testified another danger of the device is infection. Moreover, the ring can be pulled toward the shaft if the skin is tied too tightly to the plastic ring. Guthrie said the instructions to physicians did warn of these potential dangers.

The plaintiffs' brief cites no relevant authority or other evidence to support their contention that they made a submissible case against Hollister. The brief is also very confusing as to what theories of recovery the Wilsons are actually asserting against Hollister. First, they contend Hollister sold the device in a defective and unreasonably dangerous condition. Then they contend "even if plaintiffs had not made a case of strict liability in tort," the warning leaflet did not adequately inform the parents of potential dangers that could result if the ring did not fall off. Matters are further confused by the plaintiffs' motion for a new trial, which cites error in directing a verdict for Hollister, claiming only that the Wilsons made "a submissible case of negligence" against Hollister. By contrast, the points on appeal sound in negligence and strict liability. Despite the preservation problem, this court will consider the point.

■ The only factor which even remotely suggests any kind of liability on Hollister's part is that the device slipped sometime after the child left the hospital and ultimately caused harm to him. Even so, there is just no evidence in this record on which the trial court could have submitted to the jury the question of Hollister's liabil-

ity based on negligence. Likewise, there was no evidence to support a strict liability claim under § 402A of the *Restatement (Second) of Torts.* The Wilsons made no showing that would even tenuously satisfy the MAI No. 25.04 requirements that either the Plastibell device was "in a defective condition unreasonably dangerous when put to a reasonably anticipated use" or the boy was "damaged as a direct result of such defective condition." *See* MAI No. 25.04; *see also Keener v. Dayton Electric Manufacturing Co.,* 445 S.W.2d 362 (Mo. 1969)

■ Similarly, under what is characterized as a strict liability "failure to warn" cause of action, the Wilsons did not show Hollister failed to "give an adequate warning of the danger" attendant to use of the product. *See* MAI No. 25.05. The directions and warnings on use to physicians were adequate, and the warning to parents, here both read and understood, cannot as a matter of law be deemed inadequate. The judgment as to Hollister is affirmed.

As to the directed verdict for St. Luke's the evidence favorable to the plaintiffs was prior to the circumcision, someone brought the Hollister brochure to the mother in her room, gave it to her, and explained, "This is what Dr. Lockwood wants you to have. You don't have to do anything to it; it will just fall off." Janice James, a registered nurse, testified St. Luke's records failed to show whether anyone at the hospital gave the brochure to the mother or whether the Wilsons were apprised by the hospital of the propensities of the Plastibell device. She said even if the warning pamphlet had been given to the mother, someone should have explained it to her. James testified she thought the instructions on the brochure were adequate. However, a report she prepared regarding the adequacy of instructions was based on her assumption the Wilsons had been shown but had never been given the brochure.

On direct examination, plaintiffs' counsel also asked James if the mother signed the consent form for the circumcision with an informed or knowledgeable consent. How-

ever, the court sustained an objection to the nurse answering. The testimony of the Wilsons was the mother signed the consent in the hospital in the presence of the father.

It should be noted the plaintiffs' brief on the verdicts directed against them does not measure up to the requirements of Rule 84.04(c) and (d). As in the Hollister portion of the appeal, this court will attempt to figure out the gist of the appeal concerning St. Luke's so as to decide the issue on the merits. *See Willsey v. W.C. Porter Farms Co.,* 522 S.W.2d 29, 30 (Mo.App.1975). The Wilsons seem to say their consent to the circumcision was not informed. In other words, the potential risks involved in using the Plastibell device were never properly explained to them. They argue Janice James, who at the time did not practice nursing but ran a consulting firm, and who did not participate in the circumcision, should have been allowed to express her opinion as to whether the hospital used the requisite degree of skill and care in obtaining their consent.

■ This point is ruled against the plaintiffs. The mother testified she signed the consent form in the father's presence. At the hospital, they both were given and they both read the instructional brochure, which explained what they should do if the Plastibell device did not fall off within eight days after the circumcision. *See Silberstein v. Berwald,* 460 S.W.2d 707, 710 (Mo.1970). Attention is directed to *Ackerman v. Lerwick,* 676 S.W.2d 318 (Mo.App. 1984), where the Eastern District held a hospital has no duty to inform the patient of risks of surgery and alternative methods of treatment simply because it furnishes a consent-to-surgery form. "The duty to inform rests with the physician and requires exercise of a delicate medical judgment." *Id.* at 320–21. Furthermore, it was not an error to exclude part of James' testimony, since James did not qualify as an expert on disclosure of risks. *Eichelberger v. Barnes Hospital,* 655 S.W.2d 699, 704 (Mo. App.1983); *see also Aiken v. Clary,* 396 S.W.2d 668, 673 (Mo.1965). The thrust of

James' testimony was critical of the hospital for failing to note on the medical records that the brochure was given to the mother and father. However, the Wilsons are bound by their testimony that they received and read the brochure. *Silberstein, supra,* at 710. The plaintiffs did not make a submissible case against St. Luke's.

## THE DR. LOCKWOOD APPEAL

In his first point the doctor contends the trial court erred in overruling his motions for a directed verdict. He argues the plaintiffs did not make a submissible case because the evidence failed to prove he acted or performed negligently in treating the infant. He claims the Wilson's expert, Dr. Guthrie, was not properly qualified as a medical expert, and Dr. Guthrie's testimony was contradictory and confusing and was based on an incomplete hypothetical question.

■ To make a prima facie case of medical malpractice in Missouri, three elements must be established by the evidence: 1) proof that an act or omission of the of the defendant failed to meet the requisite medical standard of care; 2) proof that the act or omission was performed negligently; and 3) proof of a causal connection between the act or omission and the plaintiff's injury. *Yoos v. Jewish Hospital of St. Louis,* 645 S.W.2d 177, 183 (Mo.App.1982). Where a defendant appeals on the issue of submissibility, the evidence must be considered in a light most favorable to the plaintiff, together with all reasonable inferences, and evidence and inferences adverse to the plaintiff must be disregarded. *Smith v. Courter,* 575 S.W.2d 199, 201–02 (Mo.App. 1978).

Dr. Guthrie graduated from medical school in 1960. He had been the chairman of the Pediatrics Department at the University of Kansas Hospital and at the time of the trial was the director of a diabetes center. The defendant raised no objection to Guthrie testifying as an expert. The following questions and answers of the doctor on direct examination did not draw an objection.

Q. Let me lay the proper foundation. Assume—I'm going to ask you a hypothetical question, Doctor. Assume for purposes of this question that Mary Wilson, the mother of this child, when her circumsized boy was brought to her, observed the circumcision site. And assume that the end of the penis was sticking through the opening at the end of the Plastibell, approximately a quarter of an inch.

Assume that each day thereafter, for a period of almost 21 days, that the mother and others saw that Plastibell, and that it never moved or changed its position up until the time of the event that caused her to go to the surgeon's office and have it removed.

Assume further that it appeared just as it was pictured in Plaintiff's Exhibit 1, already admitted into evidence. [Handing exhibit to witness.]

Assuming all of those facts to be true, do you have an opinion to a reasonable degree of medical certainty as to what caused the deformity that Matthew Wilson now has on his penis?

A. Yes, I do.

Q. Can you tell us to a reasonable degree of medical certainty whether was either one thing or another? Can you limit it to two things?

A. Yes.

Q. Okay. Which two things can you tell us, to a reasonable degree of medical certainty, were involved as the effective producing mechanism of the event that caused Matthew's deformity?

A. Either the bell—the ring—was too large, and thus it slipped backwards over the corona, or back to the corona of the penis, an area where it's not supposed to be; or the skin was pulled too far forward and put under too much stretch—and thus, when it was tied to the skin, the skin in its normal elasticity pulled the ring backwards over the corona.

Q. So, were both of those precipitating events things that were controlled by

the physician who did the circumcision?

A. Yes; that's correct.

Q. The selection of the—

A. —size of the ring; and the tension on the skin.

Q. And you believe that it was either one or the other of those things.

A. Yes.

Q. Was either one an error?

A. Yes; I believe either one would have been an error.

■ The assertion on appeal that Dr. Guthrie's testimony was "neither credible nor substantial" is not well taken. At trial, the defendant never raised an objection regarding the qualifications of Dr. Guthrie. *See Eichelberger v. Barnes Hospital, supra,* at 704–05. In *Busch & Latta Painting Corp. v. State Highway Commission,* 597 S.W.2d 189 (Mo.App.1980), this court said, "[o]nce the expert has qualified, the extent and nature of his training, experience, and competence that constitute his qualifications go to the weight of the testimony and become matters to be considered by the trier of facts." *Id.* at 202.

Defendant's complaints that Dr. Guthrie had not recently performed circumcisions and gave inconsistent answers during a deposition are not persuasive. These factors go to the weight his testimony and were for the jury and not this court to consider. Dr. Lockwood relies on *Odum v. Cejas,* 510 S.W.2d 218 (Mo.App.1974), to support these arguments. In *Odum,* the expert's testimony was inherently inconsistent, and his answers going to causation were equivocal and uncertain to the extent of precluding his testimony from being used to establish a submissible case. *Id.* at 223–25. However, Dr. Guthrie never wavered in his opinion testimony at trial, and any inconsistency in his deposition testimony did not go to the elements necessary to make a submissible case.

■ Similarly, Dr. Lockwood's complaint that the hypothetical question posed to Guthrie was incomplete is not preserved or well taken. There is no requirement that the question include all material facts in evidence. *Barr v. Vickers, Inc.,* 648 S.W.2d 577, 582 (Mo.App.1983); *Cohen v. Archibald Plumbing and Heating Co.,* 555 S.W.2d 676, 682 (Mo.App.1977). The hypothetical must fairly hypothesize the material facts reasonably relevant to the case and justly present the questioner's theory of the case so the answer is of assistance to the jury. *Maples v. Charles Burt Realtor, Inc.,* 690 S.W.2d 202, 213 (Mo.App.1985); *Barr v. Vickers, supra,* at 582.

From this record the plaintiffs made a submissible case, and the court properly denied Dr. Lockwood's motions for a directed verdict as to the infant Matthew Wilson. *See Depper v. Nakada,* 558 S.W.2d 192, 198 (Mo.App.1977).

■ In his second point, Dr. Lockwood asserts the trial court erred in allowing the Wilsons to present rebuttal evidence. In his opening statement, counsel for Dr. Lockwood stated, "And Dr. Lockwood will tell you how he's done over seven hundred of these—closer to a thousand, probably, by now—and that this is the first time that he's had this particular thing happen." On cross examination the doctor testified as follows:

Q Your lawyer in his opening statement to the jury said that you had always used the Plastibell with excellent results.

A Correct.

Q That's a true statement?

A Correct.

Q You've actually gotten a bad result, haven't you—other than this one?

A No.

The trial court allowed the Wilsons, over objection, to put a witness on the stand who testified that some six months prior to Matthew Wilson's circumcision, Dr. Lockwood used the Plastibell device when he circumcised her son. The witness testified the device became entrapped on the penis, and after eleven days she brought the child to Dr. Lockwood, who slipped the ring from the boy. Two "little knicks" were left on the child's penis.

Dr. Lockwood contends the testimony was improper rebuttal and was misleading because it was collateral to the issues at trial. As a general principal, the order of proof is discretionary with the trial judge. *Fowler v. Daniel*, 622 S.W.2d 232, 235 (Mo. App.1981). The trial court's ruling on the objection was influenced by the rationale contained in *Goodman v. Firmin Desloge Hospital*, 540 S.W.2d 907 (Mo.App.1976), where the court said a clear and unequivocal statement by counsel for a party in an opening statement may constitute a judicial admission of fact and may be admitted against the party as an exception to the hearsay rule. *Id.* at 915. This being the case, the opening statement by Dr. Lockwood's counsel "opened up" the matter of whether Dr. Lockwood had in fact always had excellent results prior to the circumcision of Matthew. Rebuttal evidence is evidence tending to disprove new points first opened by the opposing side. *Peters v. Dodd*, 328 S.W.2d 603, 610 (Mo.1959). Since the defendant opened up the matter, the plaintiffs could have introduced evidence concerning Dr. Lockwood's prior results in their case in chief, but the trial court did not err in permitting it to be offered in rebuttal, after the testimony of Dr. Lockwood on cross examination. *Chrisler v. Holiday Valley, Inc.*, 580 S.W.2d 309, 314 (Mo.App.1979).

■ In his next point, Dr. Lockwood states the trial court erred in submitting Instruction No. 3 which reads as follows:

In these instructions, you are told that your verdict depends on whether or not you believe certain propositions of fact submitted to you. The burden of causing you to believe a proposition of fact is upon the party whose claim *or defense* depends upon that proposition. In determining whether or not you believe any such proposition, you must consider only the evidence and the reasonable inferences derived from the evidence. If the evidence in the case does not cause you to believe a particular proposition submitted, then you cannot return a verdict

requiring belief of that proposition. (Emphasis added).

Dr. Lockwood admits this instruction is the applicable burden of proof instruction for this case. *See* MAI No. 3.01. However, he asserts the words "or defense," according to the Notes on Use, are to be used only when an affirmative defense is submitted, and in this case no affirmative defense on either the parents' or child's claim was tendered by him. Only converse instructions on the two counts were submitted to the jury. *See* MAI No. 33.01.

■ The emphasized words should not have been used in this case. This court must now determine the prejudicial effect of the erroneous instruction. Rule 70.02(c). The plaintiff has the burden of proving no prejudice resulted. *Affiliated Foods, Inc. v. Strautman*, 656 S.W.2d 753, 763 (Mo. App.1983).

Dr. Lockwood's complaint is quite simple. Since he did not submit an affirmative defense, he could stand on a general denial and had no burden of proof at all. He says the burden was squarely on the Wilsons to prove their claims, and because the "or defense" words were added, the jury could assume he had a burden to prove his defense. Deciding this point is made more difficult because the Wilsons have done nothing on appeal to carry their burden of showing no prejudice resulted from the erroneous instruction other than their flat statement this instruction "could not have had much if any effect on the jury in this case." Despite this failure the court will consider this issue on the merits. *See id.* at 762–63; *but see id.* at 764–65 (Dixon, J., dissenting).

The correctness of an instruction depends on whether an average juror could understand the law. *Beck v. Modern American Life Insurance Co.*, 589 S.W.2d 98, 103 (Mo.App.1979). If the error, viewed in light of the totality of the instructions, is not confusing or misleading, it may be rendered harmless. *Golston v. Lincoln Cemetery, Inc.*, 573 S.W.2d 700, 706 (Mo.App. 1978).

Although the issue is very close, the error here did not shift the burden from the Wilsons to Dr. Lockwood as did the instructional error in *Mercantile Bank and Trust Co. v. Vilkins,* 675 S.W.2d 673, 675–76 (Mo.App.1984). A review of the instructions in total indicates the Wilsons still had the burden of proof on both counts. The jury still had to believe the propositions of fact in the Wilson's verdict directors, and under the instructions the burden of carrying those beliefs was on the plaintiffs. *Id.* There is no substantial indication of prejudice from this erroneous instruction, and as such, reversal is not warranted on instructional grounds. *See Fowler v. Park Corp.,* 673 S.W.2d 749, 757 (Mo. banc 1984); *J.A. Tobin Construction Co., v. State Highway Commission,* 680 S.W.2d 183, 193 (Mo.App. 1984). The Wilson's counsel made no attempt during argument to lead the jurors to believe Dr. Lockwood had any burden with regard to the defense of the case. *Fowler v. Park, supra,* at 755–56.

Dr. Lockwood next raises two points of error concerning Instruction No. 7, the verdict director for Matthew Wilson, which reads:

Your verdict must be for the plaintiff, MATTHEW WILSON, if you believe:

FIRST, defendant either:

Selected the wrong size of plastibell circumcision device or positioned or applied the said device improperly on the minor plaintiff's penis at the time of circumcision, or

That defendant pulled minor plaintiff's foreskin too far forward during the circumcision process, and

SECOND, defendant in any one or more of the respects submitted in paragraph FIRST was thereby negligent, and

THIRD, such negligence directly caused or directly contributed to cause the minor plaintiff to sustain damage.

The term "negligent" or "negligence" as used in this instruction means the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of the defendant, GARY LOCKWOOD, M.D.'s profession.

■ Dr. Lockwood initially attacks the language in the first paragraph of the instruction, which purportedly does not submit facts to the jury that constitute negligence under the infant's theory of recovery. Dr. Lockwood relies on *Grindstaff v. Tygett,* 655 S.W.2d 70 (Mo.App.1983), a medical malpractice case in which the doctor used forceps in delivering a baby. As a result, the mother's urethra was severed. As was the case here, the *Grindstaff* verdict director was an adaptation of MAI No. 21.01, but the first paragraph of the *Grindstaff* instruction contained the language "defendant performed a midforceps rotation delivery when such procedure was not medically proper." *Id.* at 72–73. The court held merely stating the procedure "was not medically proper" without including the acts or omissions complained of gave the jury no factual guidelines to determine negligence. *Id.* at 73. By contrast, the first paragraph of Instruction No. 7 did not grant the jury a roving commission. Instead, it tracked the testimony of the Wilson's expert, who said either the ring selected was too large and slipped or the foreskin was stretched too far forward, causing the ring to pull backward when it was tied to the foreskin. The verdict director did not permit the jury to find for the infant on facts different from those pleaded or proved. *See Kraus v. Kraus,* 693 S.W.2d 869, 873 (Mo.App.1985).

■ Dr. Lockwood also attacks the language in the third paragraph of Instruction No. 7. He states the failure to use the language "as a direct result of such negligence" as provided in MAI No. 21.01 amounted to error and relies on *Lawton v. Jewish Hospital of St. Louis,* 679 S.W.2d 370, 373 (Mo.App.1984) to support his proposition. The *Lawton* opinion does not aid him. Mr. Lawton was suffering from several problems when he underwent surgery at the hospital. While recuperating he fell and sustained a hip fracture. He based his suit on the hip injury. *Id.* at 371–72. His evidence of medical expenses did not delini-

ate what portion of those expenses were "directly caused" by the defendant's negligence, and the court remanded the case on the issue of damages. *Id.* at 373–75. The language in the third paragraph of Instruction No. 7 was used to account for any potential fault the jury might attribute to the parents. The result of the modification did not amount to prejudicial error. *See Fowler v. Park Corp., supra,* at 757.

■ In his next point, Dr. Lockwood seeks a new trial based on the trial court's failure to strike the testimony or submit a withdrawal instruction regarding the testimony of Dr. Chance, a psychologist. The witness was most candid in concluding the two year old child was normal at the time of trial. However, he was uncertain about the degree or extent of psychological problems or damage the child might experience in the future. Giving a withdrawal instruction rests within the sound discretion of the trial court, and absent an abuse of such discretion, refusing to give a withdrawal instruction constitutes no basis for complaint. *Parker v. Pine,* 617 S.W.2d 536, 542–43 (Mo.App.1981). The trial court's ruling against the doctor will not be disturbed.

Dr. Lockwood's next two points of error deal with the trial court's refusal to give two other withdrawal instructions under MAI No. 34.02. These withdrawal instructions dealt with two issues: (1) whether Mary and Clay Wilson were given proper instructions for the care of their son after the circumcision, and (2) whether the parents gave their informed consent. The court did not abuse its discretion on either matter, and these complaints are denied. *See Helming v. Adams,* 509 S.W.2d 159, 169 (Mo.App.1974).

■ At the close of all the evidence Dr. Lockwood asked the court to strike the entire testimony of Janice James, a registered nurse, called as an expert witness during plaintiffs' case-in-chief. James' testimony almost exclusively concerned the shoddy record-keeping by the staff at St. Luke's. James was particularly critical of the records which failed to reflect that the hospital instructed the Wilsons regarding the care of their son after the circumcision. However, the court directed St. Luke's out of the trial after the plaintiffs' evidence was received. Had Dr. Lockwood tendered a withdrawal instruction regarding James' testimony, the trial court would not have erred in sustaining it. Although James' testimony had nothing to do with the sub- mission of the case against Dr. Lockwood, the failure to strike did not result in error sufficient to reverse. Rule 84.13(b).

Finally, Dr. Lockwood contends the trial court erred in overruling his motion for judgment notwithstanding the verdict with respect to the net jury award of $90,000 to the parents. In conjunction with this issue, Dr. Lockwood asserts error in the damage instructions for the parents. Dr. Lockwood correctly points out the parents' judgment was unsupported by substantial evidence.

■ The parent of a minor child possesses a tort action to recover damages for loss of services and for medical care of the minor resulting from injuries caused by another's negligence. *Clark v. Martin,* 650 S.W.2d 699, 701 (Mo.App.1983). The minor has an action for his personal injuries. *Warner v. Pruett,* 599 S.W.2d 207, 210 (Mo.App.1980). Earlier cases such as *Garrison v. Ryno,* 328 S.W.2d 557, 563–64 (Mo.1959), and *Evans v. Farmers Elevator Co.,* 347 Mo. 326, 147 S.W.2d 593, 599–600 (1941), as well as those just mentioned, provide the child's loss of services or earning power and the medical bills are the only damages for which the Wilsons could recover.

■ The record is devoid of any evidence regarding the loss of the child's services on earning power due to the injury involved here. The testimony as to future surgery was speculative at best. Dr. Mani said cosmetic surgery would be necessitated only if the appearance of the penis bothered the boy and should not be done unless he wanted an operation to remove the scar. No evidence was offered by the parents as

to the likelihood of any such expense for an operation or for psychological therapy for the child during his minority. The Wilsons did offer testimony concerning the child's psychological impairment due to the scar on his penis, but they offered nothing specific as to the probability or cost of treatment of the impairment. A videotape of a Dr. Buchanan's testimony was shown to the jury. The file contains the video, but there is no transcription of her testimony for appellate review. There was no evidence as to present or any future urological or sexual impairment.

Showing the mere possibility that medical expenses would be incurred for treatment which might be advised in the future without showing "even a probability that additional medical expenses would be incurred during ... minority" would not support a judgment. *Kramer v. May Lumber Co.*, 432 S.W.2d 617, 622 (Mo.App.1968). A review of the transcript and evidence shows the parents were obligated for the following bills: $457 to North Kansas City Hospital for the 15 second operation to remove the device and the child's overnight stay; $100 to the doctor who performed the removal surgery; $245 to Dr. Buchanan for psychiatric fees; and $225 to Dr. Chance, a psychologist. Medical expenses totalled $1027. The net judgment of $90,000 to the parents is reversed, and on remand the trial court is to enter judgment for Mary and Clay Wilson for $924.30. This sum takes into account the ten percent apportionment of fault. Dr. Lockwood's allegations of instructional error on the parents' claim are denied.

The judgment of the trial court on the parent's claim is reversed and is remanded for the purpose of entering judgment for $924.30 for Clay and Mary Wilson. In all other respects, the judgment for the minor for $200,000 is to stand as affirmed. Costs are to be assessed equally between the Wilsons and Dr. Lockwood.

All concur.